Milton Shalleok, J.
(dissenting). “ [L]aws and institutions must go hand in hand with the progress of the human mind.” (15 The Writings of Thomas Jefferson [Memorial ed., 1904], p. 41.) And if the Fourteenth Amendment to the United States Constitution (the “free exercise” clause) “has had unsettling effects on many customs and practices ”, specifically in reference to the First Amendment (the “establishment” clause), it is “ a process consistent with Jefferson’s precept ”[1]
Have the courts adopted this Jeffersonian principle? In the main, yes. Most times it has been a long, frustrating and not infrequently belittling battle of attrition to effect important changes; for the law is a jealous guardian of fundamental stability in human relations. But an equally forceful tenet is that the courts should mold the law to conform to the growing needs and changing mores of the people who must obey the laws, or the balance of observance must necessarily become weighted on the side of defiance. This has a most unsettling effect on community order, as has been historically proved on many occasions. Unless laws have the sanction of the people they must be repealed;[2] or they fall into discard and obsolescence because they cannot be enforced equitable or equally.[3]
How does all this equate with the case before us? It concerns only a small grocer who made two minor sales of household staples; but the principle involved transcends that individual. The concern is that of the many, vis-a-vis the ‘6 Sabbath ’ ’ or “ Sunday ” or “ the Lord’s day ” law, as it is variously referred to. Specifically here involved is the generally “excepted” *795 provision in New York (Penal Law § 2147) entitled “ Public Traffic on Sunday ”.[4] It was held to be constitutional 12 years ago by our Court of Appeals (People v. Friedman, 302 N. Y. 75) and the United States Supreme'Court dismissed a further appeal to that court for its failure to present a substantial constitutional question (341 U. S. 907). More recently the Supreme Court reviewed the Sabbath laws of the States of Maryland, Massachusetts and Pennsylvania. Hundreds of pages of opinions, majority, concurring and dissenting, were written (McGowan v. Maryland, 366 U. S. 420; Gallagher v. Crown Kosher Market, 366 U. S. 617; Two Guys v. McGinley, 366 U. S. 582; Braunfeld v. Brown, 366 U. S. 599). Hardly any argument which could have been made by counsel was omitted. These were each in turn disposed of by the court — not without difficulty. As to the issues, Mr. Justice Frankfurter, had this to say: “ So deeply do the issues raised by these cases cut that it is not surprising that no one opinion can wholly express the views even of all the members of the Court who join in its result”[5] (McGowan, p. 459).
*796 A most erudite and exhaustive opinion was written by Justice Frankfurter reviewing in minutely scrutinizing detail the history of “ Sabbath ” laws. In addition he collated all present State statutes regulating labor, sales and other activities — permitted and tabued — on the “Lord’s Day”. He was not loathe to say, however, that there is no implication “ of the legitimacy of all the Sunday provisions of all the States, or of every application of the statutes now before this Court * # * It will be time enough to pass upon the constitutionality of such applications as do not reasonably come within the rationale of the present decision * * * if and when those cases arise ” (McGowan, n. 101, p. 511).
Is such a case before us now? The answer can only be found after reviewing its application to present-day thinking. That is not to say presumptuously that the majority of the United States Supreme Court is wrong in deciding as it did. It is to say, however, that even then there was diversity of minds; and, it is further to observe that the increasing pace with which the lives of Americans have changed since the majority’s pronouncement gives cause to reflect once more upon these major opinions.[6] Also, since these recent cases, the complexion of the court itself has changed. The junior members should be given an opportunity to explore the new frontiers of our current speedy, electronic living against the background of these ancient laws. Perhaps, too, the court might graciously accept an invitation to re-examine its rather perfunctory refusal to review the Friedman case over 12 years ago in the light of more modern living conditions.[7]
*797 What did this defendant do to bring down upon him criminal sanctions? The record reveals that he owns “ a small grocery store ” on Atkins Avenue in the Borough of Brooklyn. It is in a neighborhood comprised equally of Jewish and Italian residents, none of whom, nor those of “ any other denomination ” in the neighborhood would “ be offended by the conduct of this store being open on Sunday”, according to the People’s sole witness, especially since there are no ‘1 churches or houses of worship * * * in the immediate area
On Sunday, November 4, 1962 at about 1:05 p.m., the police officer on duty attended upon a sale of two quarts of milk, a loaf of bread, two bars of soap, a can of carrots and peas to one customer, and a quart of milk, a loaf of bread, a box of corn flakes and a box of crackers to another customer; whereupon he served a summons upon defendant, after explaining to him that ‘ ‘ there were certain things he couldn’t sell on Sunday ’ ’. The defendant stated to the officer at the time ‘ ‘ that he is a religious man ” — an Orthodox Jew — keeping closed from *798 Friday night at sundown through Saturday each week and that he “ stayed open on Sunday”. His religion forbids him “ to do any kind of work on Saturday ”.[8]
The defendant employs no help. He and his wife alone work in the store. His weekly gross sales average between $1,000 and $1,050. His price markup being between 15% and 17%, his income from sales ranges from $150 to $170 per week. From this are deducted fixed and other overhead items like rent, heat and light which average from $60 to $65 a week. Of the approximate $1,000 in gross sales per week, $250 of it comes from sales between 10:00 a.m. and 4:00 p.m. each Sunday. Without them, his net take-home income would be about $50 per week for the support of himself, his wife and three children. He has no capital to go into another business or training or education to take up some other profession.
He had tried other kinds of business like “ the chicken farm business ” for seven or eight years without success. He stated that “If it was profitable I wouldn’t go out of that business ”. Before then he worked in a factory for nine months earning about $28 or $29 per week; and prior thereto “ tried to learn a trade”; he “worked on shirts”. Now, without those extra hours on Sunday, he ‘ ‘ couldn’t make ends meet ’ ’. He attends his synagogue regularly on Friday nights and Saturdays. He opens his store about 6:00 p.m. on Saturday afternoons, after Synogogue — in the Winter only, for services during the Summer months are over too late to open on Saturday nights. About 80% to 85% of his customers are Jewish.
The defendant’s claim of innocence is a simple one: he either violates “ his religious belief ” or he must “ go into bankruptcy and on relief” — an unrealistic end. This, he asserts, is not merely an extra burden, an additional hardship upon him, which the courts held valid as a peripheral result of a secular end. It goes beyond even the “ cruel choice ” which Justice Stewart said could not ‘ ‘ be swept under the rug and forgotten in *799 the interest of enforced Sunday togetherness”. (Braunfeld, dissent, p 616.)
The claim of the defendant raises an interesting and fundamental question involving the dignity of man. If the alternative to a religious man — not necessarily of Christian faith — wanting to believe in and to practice, his religion (as here, without hinderance or interference to others practicing theirs or enjoying the leisurely comforts of a Sunday) is the total loss of his business enterprise and the receiving of public relief for himself and his family, then it well becomes a court to hesitate and ponder whether it would force such alternative upon him. For our Country has grown civilly strong on the foundation of the dignity of each one of its inhabitants; and it has become economically great on the right of each man to make his own destiny by his own hands and not to suffer the prideless ignominy of avoidably living off the public’s bounty. Which one of these ends is to be satisfied by section 2147 of the Penal Law?
All of these “Sunday” laws have “religiously oriented backgrounds ”.[9] But the court stated (in McGowan and Braunfeld) there was an “ evolution of Sunday Closing Laws from wholly religious sanctions to # * * the establishment of a day of community tranquillity, respite and recreation, a day when the atmosphere is one of calm and relaxation rather than one of commercialism as it is during the other six days of the week ” (p. 602). So that, even though “the freedom to hold religious beliefs and opinions is absolute” (p. 603) * * * “ the freedom to act * * * in accord with one’s religious convictions, is not totally free from legislative restrictions * * * when * * * [it is] found to be in violation of important social duties or subversive of good order ” (p. 603) and it makes no unconstitutional impact that it “ operates * * * to make the practice of * * * religious beliefs more expensive ” (p. 605). Those, who, for instance, “believe it necessary to work on Sunday ” have the “ alternatives ” of “ retaining their present occupations and incurring economic disadvantage or engaging in some other commercial activity which does not call for either Saturday or Sunday labor ’ ’ (p. 606).
“ If the purpose or effect of a law is to impede the observance * * * or to discriminate invidiously between religions ” it is unconstitutional, even if the burden is indirect, the court’s majority holds (p. 607). But in no instance has the majority *800 found a Sunday law to be other than ‘ ‘ a general law * * * to advance the State’s secular goals [by providing] one day of the week apart from the others as a day of rest, repose, recreation and tranquillity * * * a day which all members of the family and community have the opportunity to spend and enjoy together, a day on which people may visit friends and relatives who are not available during working days, a day when the weekly laborer may best regenerate himself ” (p. 607).
With most apologetic deference to the court’s majority and its cognate words in all these cases, I cannot resist the conclusions that this sophisticated court has incongruously stultified itself naively (probably as the result of reflexive early training) in an endeavor to uphold the basic coercive injunction of the religions to worship and rest on the Sabbath, and that it is unsound to accept the provision that ‘ ‘ by general consent ’ ’ “ the first day of the week ” has been “ set apart for rest and religious uses” as the day of “religious liberty of the community ” as so clearly is stated in the New York statute (Penal Law, art. 192, § 2140).
The court may call it an indirect burden and support what a State Legislature does by calling it a secular end (Reynolds v. United States, 98 U. S. 145; Prince v. Massachusetts, 321 U. S. 158), but one can hardly conclude that there is equal opportunity and freedom for the religious believer xvho is non-Christian to exercise his religion on his Lord’s day which may be other than Sunday and to foreclose him at the same time from using Sunday to work and trade without interfering with others’ repose and religion. The New York statute (Penal Law, § 2144) permits a defense of a different Sabbath to be interposed for laboring on Sunday, but if economic labor is involved in the sale of other than specified items at other than certain times on Sunday (which a defendant does to compensate for the “lost ” economic day he observes as “ holy time”) he is guilty of a misdemeanor (Penal Law, § 2142; People v. Friedman, 302 N. Y. 75, supra) although it does not “interrupt or disturb other” Sunday-observing persons.
The New York law is a hodgepodge of 1 ‘ cans ’ ’ and £ 1 cannots ’ ’ which was probably brought about more by lobby than by logic. It is true that the majority of the Supreme Court stated that the State Legislature knows best what on Sunday should and should not be allowed to its own citizens.[10] But does the court have to *801 close its eyes to the realities of the situation and turn its back on whatever a legislature does even if it makes no sense at all by its so-called ‘ ‘ distinctions ” ?[11]
We are told however, that we “ may not sit in review of the discretion of the Legislature or determine the expediency, wisdom or propriety of its action on matters within its powers (Lawrence Constr. Corp. v. State of New York, 293 N. Y. 634, 639; Matter of Russo v. Valentine, 294 N. Y. 338) ” and that while a ‘1 statute may not be perfectly symmetrical in its pattern of exclusions and inclusions, the equal protection of the laws does not require a Legislature to achieve ‘ abstract symmetry ’ (Patsone v. Pennsylvania, 232 U. S. 138, 144) or to classify with ‘ mathematical nicety ’ (Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78; Borden’s Farm Products Co. v. Baldwin, 293 U. S. 194, 209) ” (People v. Friedman, supra, pp. 79, 80).
Our purpose, then, should be to see if there is any symmetry at all in article 192 of the Penal Law and if our search reveals an unyielding legislative endeavor to obtain results without rhyme or reason (which lack of rationale concededly has on some occasions received inconsistent nods of approval from lower courts) then our highest court should strike down the offending legislation.
The whole of article 192 of the Penal Law is entitled “ Sabbath ” and its first provision is labeled “ The Sabbath ” (Sunday alone — no other); and it takes no depth of thought to conclude that the tight chains of religious impetus pervade the entire rubric of each of its remaining pertinent provisions. The injunction (§ 2140) against 1 ‘ interruptions ’’ on Sunday is not disjunctive — : against repose or religious liberty, but it is conjunctive. The “ repose and religious liberty of the community ” are tied together by statute; so that, for the purpose of this legislation one cannot enjoy repose without religion on Sunday, as that seems to be the obvious goal of this enactment.[12]
The next section defines what Sabbath breaking is and section 2142 sets forth the punishment for this misdemeanor: fine or *802 imprisonment or both. Also, “property and commodities exposed for sale * * * shall be forfeited ” in addition, after conviction (§ 2149).
According to section 2143 only ‘ ‘ works of necessity and charity ” are permitted to be the subject of labor on Sunday, into which category falls those things “ needful during the day for the good order, health or comfort of the community ”. And, as heretofore pointed out, a defendant who “ uniformly keeps another day of the week as holy time ” (not for rest, repose, tranquillity and “ togetherness ”) and who labors on Sunday without interrupting or disturbing “ other persons in observing the first day of the week as holy time ” (again, not for rest, repose, tranquillity and “ togetherness ”) has “ a sufficient defense to a prosecution ” (§ 2144).[13]
We now come to one of the main provisions of article 192, which the Supreme Court says, might give salvage to these Sunday laws; for if they provide “ recreation ”, “cheerfulness ” and “ enjoyment ” (McGowan, supra, pp. 449, 450), the statutes’ “ purpose and effect is not to aid religion ”. Section 2145 begins by prohibiting “All public sports, exercises or shows ”, and then excepts those “primarily for the entertainment of spectators * * * after two o’clock in the afternoon to witness which the public is invited or an admission fee is charged ”. Personal enjoyment activities which do not interrupt “the repose or religious liberty of the community” are not prohibited.[14]
Closely allied with section 2145 (“ Public sports and exercises on Sunday ”) are section 2151 (“Processions and Parades on Sunday”), and section 2152 (“Public Entertainment on Sunday ”) which will be alluded to in inverse order. The latter, too, begins with an absolute ban: No “legitimate theatrical performances, concert and recital dances, motion picture exhibitions, or other public exhibitions, exhibits, shows or entertainment ” shall be allowed; but excepts the conducting or participation “ in any public entertainment” on Sunday “ after two o’clock * * * to witness which the public is invited or an admission *803 fee is charged, either directly or indirectly ’ ’, provided the local legislature permits it, but only “ after such hour Also, there is a “ Grandfather” clause: if the prohibited activities (viz.: legitimate theatre productions, etc.) are now allowed locally, they may continue.
As for section 2151 it prohibits generally processions and parades on Sunday except funerals and similar processions and these “ to and from a place of worship in connection with a religious service there celebrated ’ ’. As to the latter, ‘1 music may also be played ” where the procession is “ conducted by a religious organization * * * in connection with a religious service * * * after one o’clock ”. Other parades fall into an after two o’clock category, if locally permitted.
Reverting to section 2146, persons are enjoined not to trade, manufacture or do any agricultural or mechanical work on Sunday except if they are “ works of necessity ” performed “ in their usual and orderly manner, so as not to interfere with the repose and religious liberty of the community ”. Thus finishes all of article 192 having to do with activities or services on Sunday. It leaves only the one section relating to selling. That section is 2147. It provides as follows:
‘1 All manner of public selling or offering for sale of any property upon Sunday is prohibited, except ”
1. “Food” before 10:00 a.m. (This may also be served, supplied and delivered.)
2. “ Meals ” eaten on the premises where sold, all day long.
3. “Meals ” served by “ caterers ”, all day long.
4. * ‘ Prepared tobacco, bread, milk, eggs, ice, soda-water, fruit, flowers, confectionery, souvenirs, newspapers, magazines, gasoline, oil, tires, cemetery monuments, drugs, medicine and surgical instruments ” all day long. (These may also be delivered.)
5. “ Cooked and prepared foods ”, after 4:00 p.m. and before 7:30 p.m. in addition to before 10:00 a.m., by ‘ ‘ grocers, delicatessen dealers and bakeries ”. (These may also “ supply, serve and deliver ” such cooked and prepared foods, in addition to selling them.) These same people and farmers’ markets and roadside stands selling vegetables and other farm produce, and fishing-tackle and bait stores located in places having less than 40,000 in population, all day long, “ may sell, supply, serve and deliver merchandise usually sold by them ’ ’.
6. Beer at retail, before 3:00 a.m. and after 1:00 p.m. by purchase for off-premises consumption, from Alcoholic Beverage Control law licensees; but no delivery is permitted by the latter.
Under no circumstances shall the construction of this section permit sale, exposure for sale or delivery of “ uncooked flesh *804 foods, or meats, fresh or salt ” at any time on Sunday; and delicatessen dealers shall not be considered caterers under subdivision 3. So concludes section 2147.
It seems that no discussion at all should be required to conclude that “ abstract symmetry ” or “ mathematical nicety ” is entirely antithetic to the olio of legislation just recited. Scrambled eggs have more symmetry. This article 192 could not even be described architecturally as free form. There is not a semblance of congruity or harmony about it. However, since some courts have construed this polymelian article 192 in divergent ways, brief reference to the cases and sections is constrained.
Let us begin with section 2143. What are works of necessity? or matters needful during the day for good order health or comfort? One who washes his own clothes on Sunday does not violate this section because “ Slovenliness is no part of any religion * * * Scripture recommends cleanliness ” (People v. Aliprantis, 8 A D 2d 276, 278, where the court quotes Leviticus, ch. 13, pars. 6, 34). And tied to this section, section 2146 would permit an automatic public laundry to function on Sunday provided no one connected with the owner is present (People v. Andob Corp., 25 Misc 2d 542, 543).[15] This distinction was also made in People v. Welt (14 Misc 2d 275 )[16] and a second Welt case (19 Misc 2d 462, affd. 8 N Y 2d 961) since the owner was not present and therefore was carrying on no trade!
If the owner of a laundromat should be fortunate enough to be charged with having violated section 2147 instead of section 2146, he will be acquitted (since he was not selling'but only giving service) provided, however, the Bench is favorably inclined toward Sunday activity of that kind (People v. Gwyer, 7 A D 2d *805 711). But should Ms luck be tainted by misfortune, and he comes before another Bench, he will be convicted for doing the same thing — keeping his laundromat open on Sunday (People v. Kaplan, 8 A D 2d 163).[17] Note should be made that in the Gwyer case, the fact that an automatic vending machine on the premises offered prospective users of the laundromat an opportunity to obtain soap and bleach by the deposit of coins independent of any participation by the defendant, does not bring the action within the interdiction of section 2147.
But woe to the owner of a laundromat who opens his door and turns on the lights so that customers may use the laundromat on Sunday! He will be convicted because his trade ‘ ‘ was neither necessary or charitable”; “nor was the operation of those machines a work of necessity, in the sense that it had to be done on Sunday”, hence violative of section 2143 (People v. Rubenstein, 182 N. Y. S. 2d 548; cf. People v. Welt, supra, and n. 16). Apparently, however, painting one’s mother-in-law’s house “ had to be done on Sunday ”, for a painter was acquitted for doing just that. (People v. Deen, 3 A D 2d 836.) [18]
Luck also must attend the one who runs a car-washing establishment for if the court holds it not to interrupt “ the repose and religious liberty of the community ” he is not guilty of any Sunday law violation since it is a work of necessity for the good order, health and comfort of the community (People v. Hilton, 119 N. Y. S. 2d 692); but if the court is of another mind, he will, for the same acts run afoul of the same law (People v. Schelberg, 204 Misc. 733).
As can be seen, courts really struggle with this problem. Their differences like those in our highest court, are of ideology. To them the same statutes are written in conflicting language — not *806 by actual verbiage, but by the language of early teaching, environment and religious scruples. I respect the religious beliefs cherished by any man; and I hold with our basic principles of life that each man shall have his untrammelled right to express them by words or action. But must they find their way into the law books as a means of compelling those of contrary beliefs to adhere to the rigidity of action stemming from the past ages which were left behind eons ago with our increased speed of life, with our changing ways dictated by changing means of living?
Today, for instance, automatic vending machines selling cigarettes, chewing gum, insurance, books, ice, handkerchiefs, tags, postage stamps, pencils, pens and the like are everywhere seen, daily and Sunday. They have become a part of our lives; and in the respect that they are familiar and regularly used, have become a necessary part of them. It is not in the sense, even by statute, that the term “ works of necessity ” means only those which humans cannot live without, to gain approbation; for if that is what is meant, we can live without gas, electricity, automobiles. But our lives today demand such use; and they are therefore necessary, and no court interferes with their supply on Sunday.
Both men and women, single and married, are now at work regularly. They live in apartments in the cities whose landlords profitably, in many instances, have made available for them in their basements coin-operated automatic washing and drying machines which are used by them daily and over week ends; especially bn Sunday when many of them stay close to home. Some are forced to use them on .Sunday for lack of other time. Are these immune from the statutes? (Vide, the Kaplan case, supra.) Under the Gwyer case (supra) there must be an affirmative answer, even if soap is there sold from vending machines. But if the user of the machine had no soap and had to go out and purchase the soap from the corner grocer on Sunday, as the first customer is the case before us may have done, then the grocer can, as here, be charged with a Sunday law violation.
The customer goes home and uses the automatic washer in the privacy of the basement, with the soap just purchased, with impunity (since he is undetected). But must the grocer be punished for making the clean clothes possible because he is not an automatic vending machine? How droll!
Let us now proceed to other facets of this arbitrary piece of pock-marked legislation, like the theatre, ball games and hamburgers, gardening, television and automation. These are matters affected by such sections as 2146, 2147 and 2152. I should like to preface these references by saying that if it were up to *807 me as an individual, not as a Judge, I would permit all these and other activities and services on Sunday, for I find no immoral or unethical encroachment on anyone’s else desire to worship and rest on Sunday in their own private way by attending church services and then having .their repose; for are not these matters for individual choice?
In England the days and times for performances for theatres and other entertainment and amusement were regulated by “ The Sunday Observance Act ” of 1781; and for many years professional performances for payment were completely outlawed. Then in 1843 the “ Theatres Act ” was enacted to permit the licensing authorities to determine more liberally the days and times of performances. Eighteen years after that, in this country and State, not permitting theatre performances on Sunday was held to be constitutional (Lindenmuller v. People, 33 Barb. 548).
Today, public entertainment by statute is permitted only after 2:00 p.m. on Sunday except that ‘ ‘ legitimate theatrical productions ” theretofore allowed (as well as concerts, dances and motion pictures) could be continued at other times under local law. Only stage or regular dramatic presentations, according to the lexicographers, are included in the term “ legitimate theatrical productions ’ ’. Radio and television would, therefore, come within the prohibitions of section 2152 for they are not mentioned among the exceptions of that section. But if it were tested, would any court, for instance, strike down the television entertainment presented for children before 2:00 p.m. on Sunday? Of course not. All radio and television, whether informative, entertaining or educational should be permitted at all times on Sunday, regardless of the words of any legislation, by the court’s interpretation that it is now a necessary part of our lives.
The 2 o’clock starting time for ball games is probably the arbitrary dividing time between earlier church-going and later “ secular ” enjoyment, for one court stated that while good for one’s physical and moral well-being, the playing of baseball should be confined to “ Sunday afternoon after attending church ” (People ex rel. Poole v. Hesterberg, 43 Misc. 510, 512). This has been somewhat eased by permitting personal enjoyment activities to be indulged in before 2:00 p.m., but not professional sports (§ 2145). Is there a valid distinction between these categories of amateur and professional sports?
This heterogeneous, inconglomerate collection of statutory provisions may continue to lead me concomitantly into an illogical order of discussion. I am hopeful, however, that some kind *808 of mental order may evolve therefrom. I am constrained, therefore, to talk now about aliments — week day sustenance, only partially permitted for nourishment on Sunday.
“ Food ”, says section 2147, may be sold on Sunday before 10:00 a.m. ; but if the food is “ cooked and prepared ” it may also be sold after 4:00 p.m. and before 7:30 p.m. by ‘ ‘ grocers, delicatessen dealers and bakeries ”. The reason the court gives for this “ secular ” legal restriction is that Sunday is a day for “rest”, “recreation”, “ cheerfulness ”, “ enjoyment ”, £ £ togetherness ’ ’ and the like, so that commercial activities in the common sense should not be indulged in, taking into consideration only physiological bodily requirements. This would, I presume, naturally and logically impel the statutory distinction between frankfurters and hamburgers, both of which could be bought and eaten all day long in restaurants, but only frankfurters (a prepared food to be further cooked) could be bought before 10:00 a.m. and between 4:00 p.m. and 7:30 p.m. for consumption off the premises of “ delicatessen dealers” but not uncooked hamburgers, for this is prohibited. It means that the “ togetherness ” of the family outing by automobile (for which tires, gasoline and oil can be bought all day long on Sunday) is somewhat distressfully affected by the children’s disappointment in not being able to cook hamburgers (which they love) on their portable grill but only “ hot dogs ” which they can get every day, and is no novelty for them!
Who is to be the judge of what is “rest”, “ enjoyment ”, “ recreation ”? They mean different things to different people. If “rest” is therepeutic and regenerative and is interpreted only as lying or sitting, then the advice given to President Eisenhower after his coronary occlusion by Dr. Paul Dudley White, the heart specialist, to play golf, is incorrect. Actually, the one day of rest referred to to uphold this kind of Sunday legislation is a vestige of the religious, Biblical warning not to work a full seven days. At one time it might have been the supporting crutch. Today it means little; for most people have to work only five days a week. And right now at a convention of the AFLhCIO the main discussion is whether work shall be further limited by union-management collective bargaining agreements to 35 hours a week. The newspaper strike in New York at the moment is bottomed on the fear that automation will make less work than even that. Pretty soon people will rest more than they work. Will the “ secular ” label put on Sunday “ rest ”, then be valid?
*809 As for the recreation on Sunday, some people like to watch a ball game at Yankee Stadium and at the same time munch a hamburger and drink beer which they can buy there; while others like to hear Munch lead the Boston Symphony in a Brahms work on radio while seated in their back yards, yearning for their beer and hamburger; but it is Sunday, it is the wrong food, it is the wrong place, and it is the wrong time of day. Is it logical 1
It is this kind of logic (or lobby) which: caused the amendment to section 2147 in 1953 to allow cigarettes to be sold in barrooms ; permitted pigeon food to be sold on Sunday prior to 10:00 a.m. (People v. Shifrin, 301 N. Y. 445)[19]; allowed cut flowers to be sold by a florist, but not seed or fertilizer (People v. D’Andre, 122 N. Y. S. 2d 585)[20]; acquitted a corporation for talking about but not taking orders for installing custom-made aluminum awnings and canopies ’ ’ but for the same set of acts convicted it for laboring on Sunday (People v. Polar Vent of America, 10 Misc 2d 378)[21]; decided that a farmers’ market was not a farmers’ market because it sold, besides vegetables and farm produce, 10% wearing apparel, 5% furniture, toys, etc., and the balance of 85% comprised 5000 other items, hence, outside the scope of subdivision 5 of section 2147 (People v. White of Massapequa, 12 Misc 2d 254)[22]; condoned telephone orders taken by operators on Sunday between 1:00 p.m. and 5:00 p.m. for later delivery of advertised merchandise because title was not passed on Sunday *810 and therefore Gimhels was not selling! (People v. Gimbel Bros., 202 Misc. 229); made the court, in order to acquit, define cupcakes so as to come within the term “ confectionery ” (People v. Kent, 163 Misc. 887); induced the court to turn its head away from the selling of a book in an amusement neighborhood on Sunday (People v. Law, 16 Misc 2d 696) and the audit by accountants of books on Sunday (People v. Sacks, 2 Misc 2d 201) in order not to convict.
Many more cases may be spot-checked to show how variable are the minds of the Judges on this subject. But certain it is that when the court in People v. Wolen (161 Misc. 286) decided in acquitting, that canned goods came within the definition of “ cooked and prepared foods ”, it was taking an enlightened view of the Sunday laws. It said (p. 287) that in order otherwise to “ construe these words this court would have to view them in the light of conditions prevailing in a generation long preceding that in which the amendment was enacted. In general, too, the more recent trend in legislation and in statutory interpretation is toward greater freedom of action on Sundays. ’ ’[23]
Were that only true! Comparison of court pronouncements lately indicates that the same reasoning, indeed, the same words, in some instances, are used today as a century ago. In Lindenmuller v. People (33 Barb. 548, supra) decided exactly 100 years before the McGowan, Gallagher, Two Guys and Braunfeld cases in the United States Supreme Court, stated that: ‘‘ Individual consciences may not be enforced; but men of every opinion and creed may be restrained from acts which interfere with Christian worship * * * by legislation. Christianity is not the legal religion of the state * * # but this is not inconsistent with the idea that it is in fact, and ever has been, the religion of the people # * * and acted upon by the people * * * by legislatures and by courts of justice ” (pp. 560-561).
For that reason, Justice Allen wrote: “ the Christian sabbath ’ ’ may be protected by the Legislature in such way as ‘ ‘ may be deemed essential to the peace and good order of society” (p. 567).[24] It thus becomes, says the court, “ a civil *811 and political institution ”, and the one day of rest in seven must be observed because it is so “indicated by the decalogue” (p.568).
There is one difference between the cases, just 100 years apart: the earlier case concededly acknowledges the stemming of these Sunday laws from religion — especially the Christian religion. Then it argues that Sunday religious rest so envelopes the people as to become civil and political as an idea and an accepted civil institution. Regulation is therefore constitutional. The 1961 cases state that there was a change, a metamorphoses from religion to a secular source only which justifies legislative action. But there is no proof that the legal spots have fallen from the ancient leopard’s skin in these 100 years.
Nor may one close his eyes to the wisdom of Justice Douglas’ words in McGowan (supra, pp. 572-573): “ The Court picks and chooses language from various decisions to bolster its conclusion that these Sunday laws in the modern setting are ‘ civil regulations ’. No matter how much is written, no matter what is said, the parentage of these laws is the Fourth Commandment; and they serve and satisfy the religious predispositions of our Christian communities ” (dissent in all four cases).
Since these original laws the world has emerged as a different phenomenom, but the Sunday laws have not materially changed. They were promulgated at a time when the automobile was only fictional, when the Wright brothers had not yet discovered Kitty Hawk, let alone the flying machine, when the computer had not yet evolved from Edison’s fertile mind or De Forest’s vacuum tube, when other electronic marvels of all sorts were not yet conceived in anyone’s mind — radio, television, the transistor, the cryotron — when the geniuses of the Massachusetts and California Institutes of Technology had not yet been loosed upon this world to bounce sounds off the moon, to invent a Telestar Satellite to carry television across oceans and continents and before a John Glenn pioneered the way to not-too-far-off interplanetary flight.
Are we to let these ancient laws stand still and dictate static ways of life in such a moving world? I think we should not.
I close with acknowledgement of understanding of my learned brethren’s decision and my respect for their judgment that a court may only adjudicate and not usurp the function of the Legislature. Of them I ask only, if the Legislature does not respond to what seems to be out of place in our way of life, *812 must a court stand by impotently? Or should it, by decision jog its powers into appropriate action?[25] I think the latter.[26]
I conclude from the whole of the above discussion that the dignity of man deserves a better fate than that afforded him by the New York crazy-quilt legislation and the unpredictable court interpretations evolving from it.
This unfortunate defendant has unquestionably been subjected to a choice more cruel than that which Justice Stewart decried, on facts less onerous. That choice, I respectfully suggest, should be tempered by a higher court’s reassessment of the heartbeat of this legislation — religious or secular. Alternatives, though difficult of administrative policing (Braunfeld, supra, p. 608; Gallagher, supra, p. 624) can be effected to help alleviate what so many now believe to be a direct burden on one’s religious practices.
If change or progress is slow, time will increase its velocity as needs are to be satisfied. But the effort should be begun.[27]

. See Justice Douglas’s dissent in all four cases (infra, n. 11, 366 U. S. 579).

. Viz.: Federally, the prohibition amendment (U. S. Const., 18 Amdt.) and its repeal (U. S. Const., 21st Amdt.). This was brought about by the chaotic conditions of gangsterism and lawlessness emanating from the Volstead Act (41 U. S. Stat. 305). The law-abiding people finally took a firm hand with their representatives and senators, forcing the repeal of all this unwanted legislation.

. Viz.: In New York, the FeldJCrawford Act (L. 1935, ch. 976, § 2) designed as a “fair” minimum retail sales regulation. The people generally disliked it. It was more violated than observed. Enforcement became impossible. It is now a “ dead letter ” statute, still in the books, but totally without attention or action, even from its original most ardent progenitors and supporters.

. This title is confusing. It has no relation whatsoever by verbiage to vehicular movement, although it permits the sale of gasoline, oil and tires all Sunday long (subd. 4). The judicial reasons for relating it to vehicular movement may later appear.

. Mr. Justice Warren wrote the prevailing opinion in all four eases. (Braunfeld): Justices Black, Clark and Whittaker concurred; Justice Harlan concurred with Justice Frankfurter who wrote a separate concurring opinion in all four cases. Justices Brennan and Stewart concurred in result both under the “Establishment” clause and the “Equal Protection” clause, but dissented on the ground that there was no freedom of the exercise of religion. Justice Douglas wrote a dissenting opinion in all four eases. (McGowan): This was generally the same lineup. All concurred with Justice Warren’s opinion except Justice Douglas who dissented in an opinion and Justice Harlan who concurred in Justice Frankfurter’s separate opinion. (Gallagher): Justices Black, Clark and Whittaker concurred in Justice Warren’s prevailing opinion, Justice Harlan concurred in Justice Frankfurter’s separate opinion and Justices Douglas, Brennan and Stewart each wrote a separate dissenting opinion. (Two Guys): The same division as in McGowan.
This division should not be decried. For “ A dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day” (Justice Charles Evans Hughes, “The Supreme Court of the United States”, 1928, p. 68). Judge Harold R. Medina put it this way: “If we judges do not care about the way these cases are decided, and if we do not care enough to fight about them, then we are not worth the powder to blow us to hell, in my own personal opinion. So this fighting, this striving, this struggling and all that, and this dissenting and this writing separate concurring opinions with slightly different views, that is part of the procedure, my friends, and that is what makes it good. That is what we’re supposed to do ”, (N. Y. L. J,, Editorial page, col. 3, Feb. 19, 1963.)

. In various forms, over a span of many years these “ Sunday ” laws have been attacked, all, so far, with the same adverse result. However, the number of dissenting Judges has gradually increased. This has had an eroding effect upon the court’s major holdings. There are many instances where dissenting opinions later have become the majority holdings of the court upon a reassessing of basic human values (viz.: Haddock v. Haddock, 201 U. S. 562, 628, Holmes, J., dissent became the majority law in Williams V. North Carolina, 317 U. S. 287, 293, 299, 304; Lochner v. New York, 198 U. S. 45, 74 where Holmes, J., dissent in effect became majority law in Bunting v. Oregon, 243 U. S. 426; see, also, Adkins v. Children’s Hosp., 261 U. S. 525 which was overruled in West Coast Hotel Co. v. Parrish, 300 U. S. 379). Just as the wall divides the political differences in Berlin, the highest court has been divided in “ Sunday ” law cases by a wall of ideological differences; and analogously there are chinks in each.

. There is, even outside the courts, much argument for and against Sabbath laws in their present form (i.e., see pp. 579-581 of Douglas’s, J., dissenting opinion). It is not intended hereby that I as a Judge of this court which is on the lower rung of the judicial ladder, be considered contumacious of the United States Supreme Court. I am trying only to point out certain areas of change *797 which might provide the source of a reorientation in approach to the problem. (See Mapp v. Ohio, 367 U. S. 643, 645-646, 654-655, which reversed the holding in Wolf v. Colorado, 338 U. S. 25, 33.)
“The restraining power of the judiciary manifest[s] its chief worth * * * in making vocal and audible the ideas that might otherwise be silenced * * *
This function should preserve to the courts the power that now belongs to them, if only the power is exercised with insight into social values, and with suppleness of adaption to changing social needs ” (Cabdozo, J., “ The Nature of the Judicial Process ” —1921 — pp. 92-94). A statute, says Cabdozo, J. {ibid., p. 83), once construed tends “to stereotype itself in the form first cast”, but there are jurists “who maintain that the meaning of today is not always the meaning of tomorrow”.
That same jurist said: “I do not challenge the learning and power of the majority opinion. There is no gainsaying its conclusion if the judicial function is merely static. What seemed to be a division as to the law was in truth a difference of philosophy. Conceiving the judicial function as dynamic, I am still impressed with the conviction that there was here a fitting opportunity to uproot an ancient evil”.
The Rt. Hon. Lord Macmillan puts it another way: “ Judges, as they often remind us, have to administer the law as they find it, but all the time they themselves are slowly shaping and developing it. In almost every case, except the very plainest, it would be possible to decide the issue either way with reasonable legal justification. It must be so in view of the large number of decisions which are arrived at only by a majority of judicial votes, for I assume that the dissenting judges are just as convinced of the soundness of their law as are their brethren in the majority ” (Law and Ethics, 1933, 49 Scot. L. Rev. 61, 64). “And let us not be unduly alarmed by the changes we see around us, for change is essential to progress” (Law and History, 1934, 50 Scot. L. Rev. 327, 337).
A political comment attributed to Ambassador Adlai E. Stevenson recently may well apply here to an unchained judiciary: “Freedom rings everywhere, when opinions clash”.

. Some excerpts from the Union Prayer Book for Jewish Worship for evening and morning services each Friday and Saturday (pp. 18, 22, 38, 46, 54, 56, 58 and 138, for example) reveal this fact: “The children of Israel shall keep the Sabbath, to observe the Sabbath throughout their generation as a perpetual covenant ” * * * “ O help us to preserve the Sabbath as Israel's heritage from generation to generation ” * * * “ The holy God, beyond compare, giveth rest to His people on His holy Sabbath Day ”. Exodus XX, 9 and 10 of the Holy Scriptures enjoin as follows: “ Six days shalt thou labour, and do all thy work; but the seventh day is a sabbath unto the Lord thy God, in it thou shalt not do any manner of work, thou, nor thy son, nor thy daughter, nor thy man-servant, nor thy maid-servant, nor thy cattle, nor thy stranger that is within thy gates ”.

. Warren, Ch. J., in Two Guys, 366 U. S. 582, 584. (But even in that ease the current statute permitted religious motion pictures all day on Sunday in churches, but all others only after 2:00 p.m.) ; McGowan, p. 431.

. (Williamson v. Lee Optical Co., 348 U. S. 483; Soon Hing v. Crowley, 113 U. S. 703; Petit v. Minnesota, 177 U. S. 164, 165; People V. Moses, 140 N. Y. 214, 215; People v. Havnor, 149 N. Y. 195, 201-203, dismissed 170 U. S. 408; Silverberg Bros. v. Douglass, 62 Misc. 340, 342.)

. Cf. the language in Bunting v. Oregon (243 U. S. 426, 435): “ Of course, mere declaration cannot give character to a law nor turn illegal into legal operation, and when such attempt is palpable this court necessarily has the power to review.” “ There is no war between the Constitution and common sense ” (Mapp v. Ohio, 367 U. S. 643, 657).

. Since religious repose is intended, and not repose separated from religion, there may he infirmity in the basic concept of this law, constitutionally, by reason of this controlled, direct policing of the Sunday activities of persons by an invidious discrimination. It indicates, too, that the New York law has not yet matured from the pure religious to “ a general law to advance the state’s secular goals”.

. Also, since Sunday service of process is outlawed (Penal Law, § 2148), as a sop for those observing “Saturday as holy time”, process upon them subjects the server or the procurer thereof to a misdemeanor charge (Penal Law, § 2150), but only if it is done “maliciously ” (Jewish Center of Baldwin v. Winer, 216 N. Y. S. 2d 153).

. It is interesting that this is the only place where the disjunctive is used. But since all parts of all statutes on this one subject are to be read together (People v. Hilton, 119 N. Y. S. 2d 692) the import of all other conjunctive uses of the phrase “repose and religious liberty of the community” is not changed thereby.

. In that case the questions were raised whether the running of this “ laundromat ” on Sunday was carrying on a trade, and if so, was it a work of necessity? The court held that the policy and purpose of the Sunday laws were “ that periods of rest from ordinary pursuits are requisite to the well-being, morally and physically of a people” and then concluded that washing clothes came within this purpose, for if people could not do so publicly, they would have to wash at home — a necessity since there was no other day for them to do so because of their working hours. The result is undoubtedly correct; but does washing clothes, even by automatic machine, comprise “ rest from ordinary pursuits” — a requisite for the validity of Sunday laws, according to our highest court’s majority?

. The court declared the laundromat opening on Sunday to be a necessity and stated further (pp. 276-277) : “If the Legislature had wanted to prohibit the opening of one’s shop door for business on Sunday as distinguished from working on Sunday, it could have done so. Such laws exist in other States but not in New York. Desirable as it may be to uphold the time-honored customs of this community, we cannot condone the conviction of a defendant for a violation of nonexistent laws.”

. The court was divided 3 to 2 in this ease. The majority convicted on the theory that a “ trade ” was being carried on in violation of section 2146, holding that the use of the laundromat was a “ mere convenience ” and not a “ necessity ” and therefore within the proscription of article 192 of the Penal Law, which contains the Sabbath laws. The majority further relied on the ease of People v. Moses (140 N. Y. 214, 215-216) which held that the Legislature had a right to prescribe those acts which it considered serious interruptions having “ a general tendency to interfere with Sunday as a day of rest and religious worship ”. They brought the Moses ease up to date by stating: “ The plan and intent of the present Sunday laws are substantially the same as when the Moses decision was written” (which ostensibly was religious inspired). Their decision was arrived at despite the factual agreement of the entire court that defendant committed no acts “ of a character to disturb others in the community ” — a factual truth present in the instant ease before us now.

. The rationale was that “By common understanding, custom and usage in the community the work here performed by the appellant is not the kind of labor proscribed by the statute ”.

. The court said that “ ‘ Food ’ is uniformly defined by lexicographers as including nutriment for animals as well as humans ”. But the Legislature did not believe that all kinds of food was good for humans on Sunday.

. This, despite “the healthy pastime of millions of people throughout the state and nation in densely populated suburban areas where gardening has become the health pastime of many people ” (p. 589). The gardener, then, could not set a rosebush at the edge of his lawn — an act which would give him much more pleasure and “ enjoyment ” than other possible “ Sunday ” activities. The florists’ association apparently had a better lobby in Albany than the nurserymen.

. Here the court drew a distinction between sections 2143 and 2146 on the one hand and section 2147 on the other. The court held (p. 379) as to both, however, that “The Sabbath laws are remedial statutes in' harmony with the religious sentiment of the public and intended to promote public morals and good order”. This was affirmed (4 N Y 2d 954).

. This decision, too, fails to acknowledge present-day living. “ Fishing tackle and bait stores ” come within this subdivision. But these specialty shops went out with silent motion pictures. In fishing tackle shops today you can buy boots (hiplength for trout casting in streams), canoes, aluminum boats, canvas collapsible boats, portable iceboxes and stoves, raincoats, hats, etc.— all running the full gamut of sportsman’s needs.

. See Justice Breitel’s dissent in People v. Kaplan (8 A D 2d 163, 166, 168) where he said that the falure to assess the consequences of automation in the community on the question of “ trade ” was more important, for it was obvious that “no Legislature has ever considered the problem in the context of the Sunday laws”.

. Chief Justice Waebeh’s words were: “found to be in violation of important social duties or subversive of good order” (Braunfeld v. Brown, 366 U. S. 599, 603).

. “New policies are usually tentative in their beginnings, advance in firmness as they advance in acceptance. They do not at a particular moment of time spring full-perfect in extent or means from the legislative brain. Time may be necessary to fashion them to precedent customs and conditions and as they justify themselves or otherwise they pass from militancy to triumph or from question to repeal ” (Bunting v. Oregon, 243 U. S. 426, 438).

. “ When changes of manners or business have brought it about that a rule of law which corresponded to previously existing norms or standards of behavior, corresponds no longer to the present norms or standards, but on the contrary departs from them, then those forces or tendencies of development that brought the law into adaptation to the old norms and standards are effective, without legislation, but by inherent energies of the judicial process to restore the equilibrium” (p. 14). “We are told at times that change must be the work of statute, and that the function of the judicial powers is one of conservation merely. But this is historically untrue, and were it true, would be unfortunate. Violent breaks with the past must come, indeed, from legislation, but manifold are the occasions when advance or retrogression is within the competence of judges as their competence has been determined by practice and tradition” (The Paradoxes of Legal Science, Cardozo, J., 1928, p. 7).
“ The process of judging is a phase of a never-ending movement and something more is exacted of those who play their part in it than imitative reproduction, the lifeless repetition of a mechanical routine ” (The Growth of the Law, Cardozo, J., 1924, p. 105).

. “Patience and courage, and caution, Judge Cardozo holds to be essential to the orderly and progressive development of the law. ‘Justice’, he says, ‘ is not to be taken by storm. She is to be wooed by slow advances ’ ”. (Sheintag, Moulders of Legal Thought, 1943, p. 75.)