**His Excellency, Bishop Ricardo SURINACH, etc., Plaintiffs,**

v.

**Carmen T. PESQUERA de BUSQUETS, etc., Defendant.**

**Civ. No. 78–1410.**

United States District Court, D. Puerto Rico.

Nov. 8, 1978.

122

Vivas & Martínez-Texidor, Ponce, P. R., Antonio J. Suárez de la Torre, Old San Juan, P. R., Luis Alberto Piñero, Hato Rey, P. R., for plaintiffs.

José H. Herrero, Dept. of Justice, Old San Juan, P. R., for defendant.

## DECISION AND ORDER

TORRUELLA, District Judge.

On April 23, 1973 the Legislative Assembly of the Commonwealth of Puerto Rico enacted Law Number 5, establishing a Department of Consumer Affairs. Article 3 of the Act, as amended, expressly directs the Department to protect the rights of consumers, curb inflationary tendencies and establish a price control system over articles and services. Article 14(a), enables the Department to engage in all types of studies and investigations on matters affecting consumers. In furtherance of these faculties, the Secretary of the Department was

empowered, *inter alia,* to request all necessary and relevant information; inspect records, inventories, documents and physical facilities of entities under the Agency's jurisdiction; issue subpoenas to compel the attendance of witnesses and the production of documents and information; approve all necessary and reasonable rules and regulations and receive testimony and evidence related to consumer-related matters.

Plaintiffs herein are the President of the Inter-Diocesan Secretariat for Catholic Education of the Episcopal Conference of Puerto Rico of the Roman Catholic Church, the Superintendent of Schools of the Roman Catholic Church of the Archdiocese of San Juan, and the Superintendent of Schools of the Roman Catholic Dioceses of Ponce, Mayaguez, Arecibo and Caguas. The Defendant is the Secretary of Consumer Affairs of the Commonwealth of Puerto Rico.

On or about July 20, 1978, the Defendant issued an "Order to Compel Production of Documents and Information" requiring Plaintiffs to provide, within ten (10) days from the receipt of the order, the information, documents and books requested in an attached questionnaire. As per the terms of the order, the request was part of an investigation by the Department into the costs of the private schools operating in Puerto Rico, initiated pursuant to Articles 3, 6 and 14(a) of Law Number 5. The questionnaire requested information as to the number of students and teachers in the various catholic schools, salaries paid to teachers, scholarships offered, criteria used for awarding scholarships, information about the sources and funds for the financing of the private schools, annual budgets for the years 1975, 1976 and 1977, cost per student for registration and admission, monthly fees, fees for activities and for permanent improvements, medical insurance, fees for student evaluations, meals

and materials. The inquiry also covered information regarding the cost of uniforms, cost of books and sale price thereof, and data concerning numbers and salary of employees for three categories of personnel.

Plaintiffs commenced this action for injunctive and declaratory relief on July 28, 1978. The case is now submitted on Defendant's "Motion to Dismiss or Summary Judgment", and Plaintiff's brief in opposition thereto. No factual disputes are extant, and the matter is now ripe for disposition.

Plaintiffs contend that the order issued by the Defendant transgresses the Establishment and Free Exercise of Religion clauses of the Constitution of the United States, insofar as they amount to an unconstitutional entanglement of the Commonwealth with the affairs of the Catholic Schools. It is contended that the order fosters an impermissible governmental surveillance of the financial affairs of the Roman Catholic Apostolic Church and its schools.

The basic postulates of religious autonomy are articulated in the First Amendment's opening words:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."[1]

As can be readily ascertained, the thrust of this constitutional norm is twofold: the basic purpose of the Establishment and Free Exercise Clauses was "to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment . . . is . . that . . . governmentally established religion or governmental interference with religion [will not be tolerated]."[2] *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970); *Abington*

---

1. The Free Exercise Clause was deemed incorporated into the Fourteenth Amendment in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Establishment Clause was not incorporated into the Fourteenth Amendment until *Everson v. Board of* *Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

2. Nevertheless, the intention of the framers "was to state an objective, not to write a statute." *Ibid.*

*School District v. Schempp,* 374 U.S. 203, 305, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., joined by Harlan, J., concurring).

■■■ The basic threshold inquiry in this matter is whether the order challenged herein was "intended to establish or interfere with religious beliefs and practices or [has] the effect of doing so." *Id.,* 397 U.S. at 669, 90 S.Ct. at 1412. Within the context of this case, we face the "sensitive and delicate task" of balancing governmental dictates of social policy against a religious claim for exemption from requirements of general applicability.[3] *Wisconsin v. Yoder,* 406 U.S. 205, 235, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In this connection, we are mindful that certain aspects of the exercise of religion are completely immune from state interference. The government cannot compel or foster any creed or religious practice. *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), and there exists an absolute freedom to hold religious beliefs or opinions. *Cantwell v. Connecticut,* supra, 310 U.S. at 296, 303, 60 S.Ct. 900. See, *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). However, churches, like newspapers also enjoying First Amendment rights, have no constitutional immunity from State regulation. E. g., *Murdock v. Pennsylvania,* 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). State and Federal governments are not totally without authority to exercise regulatory powers over church-related matters so long as the government's participation does not involve the consideration of the doctrinal aspects of religion. See, *Maryland and Virginia Eldership of the Churches of God v. Church of God of Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970). As the Supreme Court stated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971):

"Our prior holdings do not call for total separation between church and state; to-

tal separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance law are examples of necessary and permissible contacts. Indeed, under the statutory exemption before us in *Walz,* the State had a continuing burden to ascertain that the exempt property was in fact being used for religious worship. Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall' is a blurred, indistinct and variable barrier depending on all the circumstances of a particular relationship." *Id.,* at 614, 91 S.Ct. at 2112.

Having thus summarized the general framework of analysis, we shall proceed to examine the relevant constitutional principles with particularity in order to determine whether the acts complained of are violative either of the Free Exercise Clause, the Establishment Clause or the prohibition against administrative entanglements with religion. Although these concepts overlap, we deem it appropriate to discuss them in turn, to the extent made possible by their diffuse lines of demarcation.

■■■ The Free Exercise Clause was designed to guarantee freedom of conscience by preventing any manner of compulsion in matters of religious belief. *Abington School District v. Schempp,* supra, 374 U.S. at 231, 83 S.Ct. 1560 (Brennan, J., concurring). Hence, what the Clause forbids is governmental regulation of religious beliefs as such. *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). This principle of "voluntarism" is the core of the Free Exercise Clause. See, *Toward a Constitutional Definition of Religion,* 91 Harv.L.Rev. 1056 (1978). The purpose of the guarantee is to secure religious liberty *in the individual.* Therefore, the complainant in a free exercise case must demon-

---

**3.** The investigation involved in this case is concededly addressed to all private schools in Puerto Rico.

strate that the challenged governmental action has a coercive effect against him in the practice of his religion. *Abington School District v. Schempp,* supra, 374 U.S. at 222–223, 83 S.Ct. ~t 1571–1572; see, *Wisconsin v. Yoder,* supra. In *Braunfeld v. Brown,* supra, the applicable test in free exercise challenges to regulatory state activities was set forth as follows:

"Of course, to hold unassailable all legislation regulating conduct which imposes solely an indirect burden on the observance of religion would be a gross oversimplification. If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden. *Id.* 366 U.S. at 607, 81 S.Ct. at 1148 (citation and footnote omitted).

■ When the circumstances of this case are evaluated against the aforestated legal principles, we fail to see any curtailment of the inalienable right of individuals or groups to freely embrace and practice a particular religion, as protected by the guarantees of free exercise. The Defendants have sent a questionnaire to all the private schools in Puerto Rico seeking information which does not intrude into doctrinal matters. The catholic schools, which require licenses of authorization by the Commonwealth, and which are part of a general universe of respondents, are substantially religious in purpose and scope. However, the general investigation to which they are being subject does not penalize, hinder or otherwise curtail any religious practice of Plaintiffs. *Braunfeld v. Brown,* supra, 366 U.S. at 605, 81 S.Ct. at 1144. The order challenged in this case is not

substantive in nature, and does not appear to interfere directly or indirectly, with the practice and free exercise of legitimate religious beliefs or actions. Cf. *Wisconsin v. Yoder,* supra. There is no inspection or evaluation of the schools' religious content that could resemble the scheme that was condemned in *Lemon v. Kurtzman,* supra, 403 U.S. 602, 620, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

Plaintiffs' argument that the State may not abridge the rights of parents by forcing them to accept a standardized pattern of instruction is completely inapposite to the factual situation before us. The preeminent right of parents to direct the religious upbringing of their children is not conceivably being subject to governmental curtailment or restriction by the implementation of the inquiry that Defendant purports to conduct. Furthermore, the predominance of the Commonwealth's authority in this apparent conflict would not result in confronting the religious individual with drastic choices in matters of conscience, dogma or religious observance. *Braunfeld v. Brown,* supra.

■ We also reject any suggestion of violation of the prohibition contained in the "Establishment" proviso of the First Amendment. "[F]or the men who wrote the Religion Clauses . . . the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission,* supra, 397 U.S. at 668, 90 S.Ct. at 1411; cf. *Everson v. Board of Education,* supra; *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Examination of the purpose and primary effect of the governmental action at stake is also required in an Establishment Clause framework. To pass constitutional muster, there must exist a secular legislative purpose and a primary effect that neither advances nor inhibits religion. *Abington School Dist. v. Schempp,* supra, 374 U.S. at 222, 83 S.Ct. at 1571.[4]

4. Governmental actions that inhibit religious prerogatives can also contravene the Establishment Clause. *Lemon v. Kurtzman,* supra, 403 U.S. at 612, 91 S.Ct. at 2111.

■ There can be no serious question as to the secular nature of the objectives which have led the Defendant to engage in the practices questioned in the case at bar. See *Lemon v. Kurtzman,* supra, 403 U.S. at 602, 612–613, 91 S.Ct. 2105 (1971). Without intimating any view as to the wisdom or propriety of those objectives, we must perforce reject any suggestion of non-secular motivations. Moreover, the record is devoid of any indicia that the "principal or primary effect" of the Defendant's order is the advancement or inhibition of religion. Cf. *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973).[5] In the absence of any suggestion of partiality for or against a particular class of institution and in view of the breadth of the administrative scheme, the Defendant's actions are not indicative of the sponsorship or hostility that would suggest their constitutional invalidity. *Walz v. Tax Commission,* supra, 397 U.S. at 672, 90 S.Ct. 1409.[6] Generalized government activities not aimed specifically at religious institutions but addressed to them as part of a larger group, tend to satisfy the requirement of secular effect. As the class subject to the governmental action broadens, transgression of the Constitutional bounds becomes less likely. See, *Committee for Public Education v. Nyquist,* 413 U.S. 756, 768, 782 n.38, 93 S.Ct. 2955, 2963, 2970, 37 L.Ed.2d 948 (1973).

We shall now determine whether the end result of validating the actions of Defendant would permit an "excessive" governmental entanglement with religion. *Walz v. Tax Commission,* supra, 397 U.S. at 674, 90 S.Ct. at 1414. "The First Amendment . . does not say that in every and all respects there shall be a separation of Church and State." *Zorach v. Clauson,* supra, 343 U.S. at 312, 72 S.Ct. at 683. However, the principle of separation requires the avoidance of direct "involvement of religious with secular institutions." *Sherbert v. Verner,* 374 U.S. 398, 409, 83 S.Ct. 1790, 1797, 10 L.Ed.2d 965 (1963). A finding of excessive entanglement can serve as a "warning signal" triggering close judicial scrutiny. *Committee for Public Education v. Nyquist,* supra, 413 U.S. at 797–798, 93 S.Ct. at 2977–2978; *Lemon v. Kurtzman,* supra, 403 U.S. at 624–625, 91 S.Ct. at 2116–2117.

This forbidden administrative entanglement has been deemed to arise where there exists excessive government surveillance of religious institutions and personnel. For example, the case of *Lemon v. Kurtzman,* supra, involved challenges to programs in the States of Pennsylvania and Rhode Island which were similar in scope. The Rhode Island program contemplated direct payment by the State comprising fifteen percent of the annual salaries of private schools' teachers. The program required schools to submit financial data to determine eligibility of recipients, as well as examination of the records of the school in particular cases. In turn, the Pennsylvania Statute provided for reimbursement of the cost of teachers' salaries, textbooks and instructional materials in specified secular subjects. Private schools seeking reimbursement were required to maintain prescribed accounting procedures identifying the costs of the separate secular educational services. These accounts were subject to audits by the State, which had the authority to approve or reject the textbooks and materials included in the program. The statute prohibited reimbursement for any course that contained "any subject matter expressing religious teaching, or the morals or forms of worship of any sect." *Id.,* 403 U.S. at 610, 91 S.Ct. at 2110.

The Supreme Court struck down both programs, finding that they fostered an im-

---

5. The governmental intrusion involved in *Hunt* was far more affirmative than the actions of the Defendant in the present case, inasmuch as the governmental agency had a supervisory function over the manner and details in which fees were charged for the college facilities financed by the State. *Id.,* 413 U.S. at 748, 93 S.Ct. at 2876.

6. "We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952).

permissible relationship between government and religion.

██ In the case at bar we do not find that the cumulative impact of the administrative scheme involves such an excessive entanglement. The investigation initiated by the Department of Consumer Affairs does not give rise to a potential for impermissible intrusion into the realms of religious belief. *Lemon,* supra, at p. 619, 91 S.Ct. 2105. The record fails to suggest a "comprehensive, discriminating, and continuing state surveillance" indicative of "excessive and enduring entanglement." *Ibid.* No "state inspection and evaluation of . . . religious content" is present. *Id.,* at 620, 91 S.Ct. at 2115. Contrary to the situation is *Walz v. Tax Commission,* supra, the Defendant's actions do not represent governmental evaluation of religious practices, extensive investigations or the entanglement of "government in difficult classifications of what is or not religions." *Id.,* at 698, 90 S.Ct., at 1426 (Harlan, J., concurring); see also, *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 316, 34 L.Ed.2d 240 (1973).[7]

Moreover, the order attacked in this suit does not affect "the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976); also see, *Presbyterian Church v. Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Under the factual background presented, and particularly in view of the preliminary nature of the administrative action challenged in this case, we are convinced that the Church's authorities are not compelled to share any decision making with the State in matters of substantive educational policy. Cf. *Catholic Bishop of Chicago v. N.L.R.B.,* 559 F.2d 1112 (C.A. 7, 1977).[8]

In conclusion, the facts in this case do not present any realizable danger of governmental intrusion into the realm of protected religious freedoms. The acts of the Defendant do not portend an actionable involvement in the apparatus or spirit of religion. Cf. *Watson v. Jones,* 80 U.S. 679, 729, 13 Wall. 679, 20 L.Ed. 666 (1871).

The record in this case is devoid of any substantial indicia of a realizable regulation of the internal financial affairs of the Catholic Schools. Furthermore, the Defendant has not palpably limited the tuition costs of the schools. We therefore are in no position to decide the validity of an actual governmental regulation in these areas. We simply hold that the *status quo* fails to support a cause of action under the religious clauses of the First Amendment. See, *Grutka v. Barbour,* 549 F.2d 5, 10 (C.A. 7, 1977), cert. den. 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394.[9]

---

7. The undisputed religious character of the Catholic Schools in Puerto Rico is an important element for purposes of the instant query. *Lemon v. Kurtzman,* supra, 403 U.S. at 616, 91 S.Ct. 2105. However, the same is not dispositive in the absence of the type of excessive governmental intrusion described hereinabove.

8. Plaintiffs argue that the Commonwealth is precluded from imposing minimum wage or labor relations upon Catholic schools. We need not decide this question, insofar as such an intent is nowhere suggested by the evidence.

9. We need not decide whether the Commonwealth has the power to regulate or investigate the finances of private schools in the light of other constitutional guarantees. As we stated before, the absence of an immediate possibility of actual regulation counsels against our entertaining issues which may be affected by future events of an uncertain nature. See *United Public Workers of America v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd,* 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954). Moreover, Defendants' actions in this case are challenged strictly on First Amendment grounds. We need not go beyond the constitutional issues necessarily raised by the record, *Solesbee v. Balkcom,* 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950), at least not until a stage has been reached where such issues may become justiciable. *United States v. Spector,* 343 U.S. 169, 172, 72 S.Ct. 591, 96 L.Ed. 863 (1952).

128

The Complaint filed in this case is hereby DISMISSED. The Clerk of the Court shall enter Judgment accordingly.

IT IS SO ORDERED.