## BRAUNFELD ET AL. *v.* BROWN, COMMISSIONER OF POLICE OF PHILADELPHIA, ET AL.

No. 67.   Argued December 8, 1960.—Decided May 29, 1961.

*Theodore R. Mann* argued the cause for appellants. With him on the brief were *Marvin Garfinkel* and *Stephen B. Narin.*

*David Berger* argued the cause and filed a brief for appellees.

*Arthur Littleton, Benjamin M. Quigg, Jr.* and *Russell C. Dilks* filed a brief for the Pennsylvania Retailers' Association, intervening defendant-appellee.

Briefs of *amici curiae,* urging affirmance, were filed by *S. G. Lippman* for the Retail Clerks International Association, AFL–CIO, and *George C. Warner* for the National Retail Merchants Association.

*Leo Pfeffer, Lewis H. Weinstein, Shad Polier* and *Samuel Lawrence Brennglass* filed a brief for the Synagogue Council of America et al., as *amici curiae,* urging reversal.

Mr. Chief Justice Warren announced the judgment of the Court and an opinion in which Mr. Justice Black, Mr. Justice Clark, and Mr. Justice Whittaker concur.

This case concerns the constitutional validity of the application to appellants of the Pennsylvania criminal statute,[1] enacted in 1959, which proscribes the Sunday retail sale of certain enumerated commodities. Among the questions presented are whether the statute is a law

---

[1] 18 Purdon's Pa. Stat. Ann. (1960 Cum. Supp.) § 4699.10 provides:

"Selling certain personal property on Sunday

"Whoever engages on Sunday in the business of selling, or sells or offers for sale, on such day, at retail, clothing and wearing apparel, clothing accessories, furniture, housewares, home, business or office furnishings, household, business or office appliances, hardware, tools, paints, building and lumber supply materials, jewelry, silverware, watches, clocks, luggage, musical instruments and recordings, or toys, excluding novelties and souvenirs, shall, upon conviction thereof in a summary proceeding for the first offense, be sentenced to pay a fine of not exceeding one hundred dollars ($100), and for the second or any subsequent offense committed within one year after conviction for the first offense, be sentenced to pay a fine of not exceeding two hundred dollars ($200) or undergo imprisonment not exceeding thirty days in default thereof.

"Each separate sale or offer to sell shall constitute a separate offense.

"Information charging violations of this section shall be brought within seventy-two hours after the commission of the alleged offense and not thereafter."

respecting an establishment of religion and whether the statute violates equal protection. Since both of these questions, in reference to this very statute, have already been answered in the negative, *Two Guys from Harrison-Allentown, Inc.,* v. *McGinley, ante,* p. 582, and since appellants present nothing new regarding them, they need not be considered here. Thus, the only question for consideration is whether the statute interferes with the free exercise of appellants' religion.

Appellants are merchants in Philadelphia who engage in the retail sale of clothing and home furnishings within the proscription of the statute in issue. Each of the appellants is a member of the Orthodox Jewish faith, which requires the closing of their places of business and a total abstention from all manner of work from nightfall each Friday until nightfall each Saturday. They instituted a suit in the court below seeking a permanent injunction against the enforcement of the 1959 statute. Their complaint, as amended, alleged that appellants had previously kept their places of business open on Sunday; that each of appellants had done a substantial amount of business on Sunday, compensating somewhat for their closing on Saturday; that Sunday closing will result in impairing the ability of all appellants to earn a livelihood and will render appellant Braunfeld unable to continue in his business, thereby losing his capital investment; that the statute is unconstitutional for the reasons stated above.

A three-judge court was properly convened and it dismissed the complaint on the authority of the *Two Guys From Harrison* case. 184 F. Supp. 352. On appeal brought under 28 U. S. C. § 1253, we noted probable jurisdiction, 362 U. S. 987.

Appellants contend that the enforcement against them of the Pennsylvania statute will prohibit the free exercise

of their religion because, due to the statute's compulsion to close on Sunday, appellants will suffer substantial economic loss, to the benefit of their non-Sabbatarian competitors, if appellants also continue their Sabbath observance by closing their businesses on Saturday; that this result will either compel appellants to give up their Sabbath observance, a basic tenet of the Orthodox Jewish faith, or will put appellants at a serious economic disadvantage if they continue to adhere to their Sabbath. Appellants also assert that the statute will operate so as to hinder the Orthodox Jewish faith in gaining new adherents. And the corollary to these arguments is that if the free exercise of appellants' religion is impeded, that religion is being subjected to discriminatory treatment by the State.

In *McGowan* v. *Maryland, ante,* at pp. 437–440, we noted the significance that this Court has attributed to the development of religious freedom in Virginia in determining the scope of the First Amendment's protection. We observed that when Virginia passed its Declaration of Rights in 1776, providing that "all men are equally entitled to the free exercise of religion," Virginia repealed its laws which in any way penalized "maintaining any opinions in matters of religion, forbearing to repair to church, or the exercising any mode of worship whatsoever." But Virginia retained its laws prohibiting Sunday labor.

We also took cognizance, in *McGowan,* of the evolution of Sunday Closing Laws from wholly religious sanctions to legislation concerned with the establishment of a day of community tranquillity, respite and recreation, a day when the atmosphere is one of calm and relaxation rather than one of commercialism, as it is during the other six days of the week. We reviewed the still growing state

preoccupation with improving the health, safety, morals and general well-being of our citizens.

Concededly, appellants and all other persons who wish to work on Sunday will be burdened economically by the State's day of rest mandate; and appellants point out that their religion requires them to refrain from work on Saturday as well. Our inquiry then is whether, in these circumstances, the First and Fourteenth Amendments forbid application of the Sunday Closing Law to appellants.

Certain aspects of religious exercise cannot, in any way, be restricted or burdened by either federal or state legislation. Compulsion by law of the acceptance of any creed or the practice of any form of worship is strictly forbidden. The freedom to hold religious beliefs and opinions is absolute. *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Reynolds* v. *United States,* 98 U. S. 145, 166. Thus, in *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, this Court held that state action compelling school children to salute the flag, on pain of expulsion from public school, was contrary to the First and Fourteenth Amendments when applied to those students whose religious beliefs forbade saluting a flag. But this is not the case at bar; the statute before us does not make criminal the holding of any religious belief or opinion, nor does it force anyone to embrace any religious belief or to say or believe anything in conflict with his religious tenets.

However, the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions. *Cantwell* v. *Connecticut, supra,* at pp. 303–304, 306. As pointed out in *Reynolds* v. *United States, supra,* at p. 164, legislative power over mere opinion is forbidden but it may reach people's actions when they are found to be in violation of important social duties or subversive of good order, even when

the actions are demanded by one's religion. This was articulated by Thomas Jefferson when he said:

> "Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that *the legislative powers of government reach actions only, and not opinions,* I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced *he has no natural right in opposition to his social duties.*" (Emphasis added.) 8 Works of Thomas Jefferson 113.[2]

And, in the *Barnette* case, the Court was careful to point out that "The freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual. It is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin. . . . It is . . . to be noted that the compulsory flag salute and

---

[2] Oliver Ellsworth, a member of the Constitutional Convention and later Chief Justice, wrote:

"But while I assert the rights of religious liberty, I would not deny that the civil power has a right, in some cases, to interfere in matters of religion. It has a right to prohibit and punish gross immoralities and impieties; because the open *practice* of these is of evil example and detriment." (Emphasis added.) Written in the Connecticut Courant, Dec. 17, 1787, as quoted in 1 Stokes, Church and State in the United States, 535.

pledge requires *affirmation of a belief* and an *attitude of mind.*" 319 U. S., at 630, 633. (Emphasis added.)

Thus, in *Reynolds* v. *United States,* this Court upheld the polygamy conviction of a member of the Mormon faith despite the fact that an accepted doctrine of his church then imposed upon its male members the *duty* to practice polygamy. And, in *Prince* v. *Massachusetts,* 321 U. S. 158, this Court upheld a statute making it a crime for a girl under eighteen years of age to sell any newspapers, periodicals or merchandise in public places despite the fact that a child of the Jehovah's Witnesses faith believed that it was her religious *duty* to perform this work.

It is to be noted that, in the two cases just mentioned, the religious practices themselves conflicted with the public interest. In such cases, to make accommodation between the religious action and an exercise of state authority is a particularly delicate task, *id.,* at 165, because resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution.

But, again, this is not the case before us because the statute at bar does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive. Furthermore, the law's effect does not inconvenience all members of the Orthodox Jewish faith but only those who believe it necessary to work on Sunday.[3] And even these are not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution. Fully recognizing that the alter-

---

[3] See the concurring opinion of Mr. Justice Cardozo, joined by Mr. Justice Brandeis and Mr. Justice Stone, in *Hamilton* v. *Regents,* 293 U. S. 245, 265–268.

natives open to appellants and others similarly situated—retaining their present occupations and incurring economic disadvantage or engaging in some other commercial activity which does not call for either Saturday or Sunday labor—may well result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful.

To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, *i. e.*, legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature. Statutes which tax income and limit the amount which may be deducted for religious contributions impose an indirect economic burden on the observance of the religion of the citizen whose religion requires him to donate a greater amount to his church; statutes which require the courts to be closed on Saturday and Sunday impose a similar indirect burden on the observance of the religion of the trial lawyer whose religion requires him to rest on a weekday. The list of legislation of this nature is nearly limitless.

Needless to say, when entering the area of religious freedom, we must be fully cognizant of the particular protection that the Constitution has accorded it. Abhorrence of religious persecution and intolerance is a basic part of our heritage. But we are a cosmopolitan nation made up of people of almost every conceivable religious preference. These denominations number almost three hundred. Year Book of American Churches for 1958, 257 *et seq.* Consequently, it cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions. We do not believe that such an effect is an absolute test

for determining whether the legislation violates the freedom of religion protected by the First Amendment.

Of course, to hold unassailable all legislation regulating conduct which imposes solely an indirect burden on the observance of religion would be a gross oversimplification. If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden. See *Cantwell* v. *Connecticut, supra,* at pp. 304–305.[4]

As we pointed out in *McGowan* v. *Maryland, supra,* at pp. 444–445, we cannot find a State without power to provide a weekly respite from all labor and, at the same time, to set one day of the week apart from the others as a day of rest, repose, recreation and tranquillity—a day when the hectic tempo of everyday existence ceases and a more pleasant atmosphere is created, a day which all members of the family and community have the opportunity to spend and enjoy together, a day on which people may visit friends and relatives who are not available during working days, a day when the weekly laborer may best regenerate himself. This is particularly true in this day and age of increasing state concern with public welfare legislation.

---

[4] Thus in cases like *Murdock* v. *Pennsylvania,* 319 U. S. 105, and *Follett* v. *McCormick,* 321 U. S. 573, this Court struck down municipal ordinances which, in application, required religious colporteurs to pay a license tax as a condition to the pursuit of their activities because the State's interest, the obtaining of revenue, could be easily satisfied by imposing this tax on nonreligious sources.

Also, in *McGowan,* we examined several suggested alternative means by which it was argued that the State might accomplish its secular goals without even remotely or incidentally affecting religious freedom. *Ante,* at pp. 450–452. We found there that a State might well find that those alternatives would not accomplish bringing about a general day of rest. We need not examine them again here.

However, appellants advance yet another means at the State's disposal which they would find unobjectionable. They contend that the State should cut an exception from the Sunday labor proscription for those people who, because of religious conviction, observe a day of rest other than Sunday. By such regulation, appellants contend, the economic disadvantages imposed by the present system would be removed and the State's interest in having all people rest one day would be satisfied.

A number of States provide such an exemption,[5] and this may well be the wiser solution to the problem. But our concern is not with the wisdom of legislation but with its constitutional limitation. Thus, reason and experience teach that to permit the exemption might well undermine the State's goal of providing a day that, as best possible, eliminates the atmosphere of commercial noise and activity. Although not dispositive of the issue, enforcement problems would be more difficult since there would be two or more days to police rather than one and it would be more difficult to observe whether violations were occurring.

Additional problems might also be presented by a regulation of this sort. To allow only people who rest on a day other than Sunday to keep their businesses open on that day might well provide these people with an economic advantage over their competitors who must

---

[5] *E. g.,* Ind. Ann. Stat. § 10–4301.

remain closed on that day;[6] this might cause the Sunday-observers to complain that their religions are being discriminated against. With this competitive advantage existing, there could well be the temptation for some, in order to keep their businesses open on Sunday, to assert that they have religious convictions which compel them to close their businesses on what had formerly been their least profitable day. This might make necessary a state-conducted inquiry into the sincerity of the individual's religious beliefs,[7] a practice which a State might believe would itself run afoul of the spirit of constitutionally protected religious guarantees. Finally, in order to keep the disruption of the day at a minimum, exempted employers would probably have to hire employees who themselves qualified for the exemption because of their own religious beliefs,[8] a practice which a State might feel to be opposed to its general policy prohibiting religious discrimination in hiring.[9] For all of these reasons, we cannot say that the Pennsylvania statute before us is invalid, either on its face or as applied.

MR. JUSTICE HARLAN concurs in the judgment. MR. JUSTICE BRENNAN and MR. JUSTICE STEWART concur in

[6] "If he [the Orthodox Jewish storekeeper] opens on Saturday, he is subjected to very fierce competition indeed from Christian shopkeepers, whereas on Sunday, supposing he closes on Saturday, he has an absolutely free run and no competition from Christian shopkeepers at all." 311 Parliamentary Debates, Commons, 492.

"It is true that the orthodox Jew will only be allowed to trade until two o'clock on Sunday, but during that time he will have a monopoly. That is a tremendous advantage. In many districts he will be the only trader with a shop open in that district." 101 Parliamentary Debates, Lords, 430.

[7] Connecticut, which has such an exemption statute, requires that Sabbatarians, in order to qualify, file a written notice of religious belief with the prosecuting attorney. Conn. Gen. Stat. Rev. § 53–303.

[8] E. g., Va. Code Ann., § 18.1–359.

[9] E. g., 43 Purdon's Pa. Stat. Ann. (1960 Cum. Supp.) §§ 951–963.

our disposition of appellants' claims under the Establishment Clause and the Equal Protection Clause. MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN have rejected appellants' claim under the Free Exercise Clause in a separate opinion.

Accordingly, the decision is

*Affirmed.*

[For opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE HARLAN, see *ante,* p. 459.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *ante,* p. 561.]

MR. JUSTICE BRENNAN, concurring and dissenting.

I agree with THE CHIEF JUSTICE that there is no merit in appellants' establishment and equal-protection claims. I dissent, however, as to the claim that Pennsylvania has prohibited the free exercise of appellants' religion.

The Court has demonstrated the public need for a weekly surcease from worldly labor, and set forth the considerations of convenience which have led the Commonwealth of Pennsylvania to fix Sunday as the time for that respite. I would approach this case differently, from the point of view of the individuals whose liberty is—concededly—curtailed by these enactments. For the values of the First Amendment, as embodied in the Fourteenth, look primarily towards the preservation of personal liberty, rather than towards the fulfillment of collective goals.

The appellants are small retail merchants, faithful practitioners of the Orthodox Jewish faith. They allege—and the allegation must be taken as true, since the case comes to us on a motion to dismiss the complaint—that ". . . one who does not observe the Sabbath [by refraining from labor] . . . cannot be an Orthodox Jew."

In appellants' business area Friday night and Saturday are busy times; yet appellants, true to their faith, close during the Jewish Sabbath, and make up some, but not all, of the business thus lost by opening on Sunday. "Each of the plaintiffs," the complaint continues, "does a substantial amount of business on Sundays, and the ability of the plaintiffs to earn a livelihood will be greatly impaired by closing their business establishment on Sundays." Consequences even more drastic are alleged: "Plaintiff, Abraham Braunfeld, will be unable to continue in his business if he may not stay open on Sunday and he will thereby lose his capital investment." In other words, the issue in this case—and we do not understand either appellees or the Court to contend otherwise—is whether a State may put an individual to a choice between his business and his religion. The Court today holds that it may. But I dissent, believing that such a law prohibits the free exercise of religion.

The first question to be resolved, however, is somewhat broader than the facts of this case. That question concerns the appropriate standard of constitutional adjudication in cases in which a statute is assertedly in conflict with the First Amendment, whether that limitation applies of its own force, or as absorbed through the less definite words of the Fourteenth Amendment. The Court in such cases is not confined to the narrow inquiry whether the challenged law is rationally related to some legitimate legislative end. Nor is the case decided by a finding that the State's interest is substantial and important, as well as rationally justifiable. This canon of adjudication was clearly stated by Mr. Justice Jackson, speaking for the Court in *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 639 (1943):

> "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for

transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case."

This exacting standard has been consistently applied by this Court as the test of legislation under all clauses of the First Amendment, not only those specifically dealing with freedom of speech and of the press. For religious freedom—the freedom to believe and to practice strange and, it may be, foreign creeds—has classically been one of the highest values of our society. See, *e. g.*, *Murdock* v. *Pennsylvania*, 319 U. S. 105, 115 (1943); *Jones* v. *City of Opelika*, 319 U. S. 103 (1943); *Martin* v. *City of Struthers*, 319 U. S. 141 (1943); *Follett* v. *Town of McCormick*, 321 U. S. 573 (1944); *Marsh* v. *Alabama*, 326 U. S. 501, 510 (1946). Even the most concentrated and fully articulated attack on this high standard has seemingly admitted its validity in principle, while

deploring some incidental phraseology. See *Kovacs* v. *Cooper,* 336 U. S. 77, 89, 95–96 (1949) (concurring opinion); but cf. *Ullmann* v. *United States,* 350 U. S. 422 (1956). The honored place of religious freedom in our constitutional hierarchy, suggested long ago by the argument of counsel in *Permoli* v. *Municipality No. 1 of the City of New Orleans,* 3 How. 589, 600 (1845), and foreshadowed by a prescient footnote in *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4 (1938), must now be taken to be settled. Or at least so it appeared until today. For in this case the Court seems to say, without so much as a deferential nod towards that high place which we have accorded religious freedom in the past, that any substantial state interest will justify encroachments on religious practice, at least if those encroachments are cloaked in the guise of some nonreligious public purpose.

Admittedly, these laws do not compel overt affirmation of a repugnant belief, as in *Barnette,* nor do they prohibit outright any of appellants' religious practices, as did the federal law upheld in *Reynolds* v. *United States,* 98 U. S. 145 (1878), cited by the Court. That is, the laws do not say that appellants must work on Saturday. But their effect is that appellants may not simultaneously practice their religion and their trade, without being hampered by a substantial competitive disadvantage. Their effect is that no one may at one and the same time be an Orthodox Jew and compete effectively with his Sunday-observing fellow tradesmen. This clog upon the exercise of religion, this state-imposed burden on Orthodox Judaism, has exactly the same economic effect as a tax levied upon the sale of religious literature. And yet, such a tax, when applied in the form of an excise or license fee, was held invalid in *Follett* v. *Town of McCormick, supra.* All this the Court, as I read its opinion, concedes.

What, then, is the compelling state interest which impels the Commonwealth of Pennsylvania to impede

appellants' freedom of worship? What overbalancing need is so weighty in the constitutional scale that it justifies this substantial, though indirect, limitation of appellants' freedom? It is not the desire to stamp out a practice deeply abhorred by society, such as polygamy, as in *Reynolds,* for the custom of resting one day a week is universally honored, as the Court has amply shown. Nor is it the State's traditional protection of children, as in *Prince* v. *Massachusetts,* 321, U. S. 158 (1944), for appellants are reasoning and fully autonomous adults. It is not even the interest in seeing that everyone rests one day a week, for appellants' religion requires that they take such a rest. It is the mere convenience of having everyone rest on the same day. It is to defend this interest that the Court holds that a State need not follow the alternative route of granting an exemption for those who in good faith observe a day of rest other than Sunday.

It is true, I suppose, that the granting of such an exemption would make Sundays a little noisier, and the task of police and prosecutor a little more difficult. It is also true that a majority—21—of the 34 States which have general Sunday regulations have exemptions of this kind.[1] We are not told that those States are significantly noisier, or that their police are significantly more burdened, than

---

[1] Conn. Gen. Stat., 1958 rev., § 53–303; Fla. Laws 1959, c. 59–1650, § 2; Ill. Rev. Stat., 1959, c. 38, § 549; Burns' Ind. Ann. Stat., 1956 repl., § 10–4301; Kan. Gen. Stat. Ann., 1949, § 21–953; Ky. Rev. Stat., 1959, § 436.160 (2); Me. Rev. Stat., 1954, c. 134, § 44; Mass. Gen. Laws Ann., 1958, c. 136, § 6; Mich. Stat. Ann., 1957 rev., §§ 18.855, 18.122, 9.2702; Mo. Rev. Stat., 1959, § 563.700; Neb. Rev. Stat., 1943, § 28–940; N. J. Stat. Ann., 1953, § 2A:171–4; McKinney's N. Y. Laws, Penal Law § 2144; N. D. Rev. Code, 1943, § 12–2117; Page's Ohio Rev. Code Ann., 1954, § 3773.24; Okla. Stat. Ann., 1958, Tit. 21, § 909; R. I. Gen. Laws, 1956, § 11–40–4; S. D. Code, 1939, § 13.1710; Tex. Pen. Code Art. 284; Va. Code, 1950, § 18.1–359; Wash. Rev. Code, 1951, § 9.76.020; W. Va. Code Ann., 1955, c. 61, Art. 8, § 6073. Cf. Wis. Stat. Ann., 1958, § 301.33.

Pennsylvania's. Even England, not under the compulsion of a written constitution, but simply influenced by considerations of fairness, has such an exemption for some activities.[2] The Court conjures up several difficulties with such a system which seem to me more fanciful than real. Non-Sunday observers might get an unfair advantage, it is said. A similar contention against the draft exemption for conscientious objectors (another example of the exemption technique) was rejected with the observation that "its unsoundness is too apparent to require" discussion. *Selective Draft Law Cases,* 245 U. S. 366, 390 (1918). However widespread the complaint, it is legally. baseless, and the State's reliance upon it cannot withstand a First Amendment claim. We are told that an official inquiry into the good faith with which religious beliefs are held might be itself unconstitutional. But this Court indicated otherwise in *United States* v. *Ballard,* 322 U. S. 78 (1944). Such an inquiry is no more an infringement of religious freedom than the requirement imposed by the Court itself in *McGowan* v. *Maryland, ante,* p. 420, decided this day, that a plaintiff show that his good-faith religious beliefs are hampered before he acquires standing to attack a statute under the Free-Exercise Clause of the First Amendment. Finally, I find the Court's mention of a problem under state antidiscrimination statutes almost chimerical. Most such statutes provide that hiring may be made on a religious basis if religion is a *bona fide* occupational qualification.[3] It happens, moreover, that Pennsylvania's statute has such a provision.[4]

In fine, the Court, in my view, has exalted administrative convenience to a constitutional level high enough to

---

[2] *E. g.,* Shops Act, 1950, 14 Geo. VI, c. 28, § 53.

[3] *E. g.,* Mass. Gen. Laws Ann., 1958, c. 151B, § 4, par. 1.

[4] 43 Purdon's Pa. Stat. Ann. (1960 Cum. Supp.) § 955.

justify making one religion economically disadvantageous. The Court would justify this result on the ground that the effect on religion, though substantial, is indirect. The Court forgets, I think, a warning uttered during the congressional discussion of the First Amendment itself: ". . . the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand . . . ." [5]

I would reverse this judgment and remand for a trial of appellants' allegations, limited to the free-exercise-of-religion issue.

MR. JUSTICE STEWART, dissenting.

I agree with substantially all that MR. JUSTICE BRENNAN has written. Pennsylvania has passed a law which compels an Orthodox Jew to choose between his religious faith and his economic survival. That is a cruel choice. It is a choice which I think no State can constitutionally demand. For me this is not something that can be swept under the rug and forgotten in the interest of enforced Sunday togetherness. I think the impact of this law upon these appellants grossly violates their constitutional right to the free exercise of their religion.

---

[5] I Annals of Cong. 730 (remarks of Representative Daniel Carroll of Maryland, August 15, 1789).