**Nevitt F. ENSMINGER, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 77–2302.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 13, 1978.

Decided Dec. 4, 1979.

---

Barry Nakell, Chapel Hill, N. C. (William J. Turnier, School of Law, University of North Carolina, Chapel Hill, N. C., on brief), for appellant.

James A. Riedy, Atty., Tax Division, Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Michael L. Paup, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, PHILLIPS, Circuit Judge, and HOFFMAN*, Senior District Judge.

HAYNSWORTH, Chief Judge:

The Commissioner of Internal Revenue assessed a deficiency of $128 upon the taxpayer, Nevitt F. Ensminger, after an examination of his income tax return for his 1974 tax year. The deficiency arose out of a disallowance of a dependency deduction for a 21-year old woman who lived with him and was supported by him. The disallowance in turn was based upon the conclusion that the relationship between the taxpayer and the young woman "[was] in violation of local law" within the meaning of § 152(b)(5) of the Internal Revenue Code,[1] since lewd and lascivious cohabitation is a statutory misdemeanor in North Carolina.[2]

Ensminger contested the deficiency in the Tax Court where his principal contention was that the North Carolina statute was an unconstitutional invasion of his right to privacy. The Tax Court, while discussing less serious objections to the enforcement of the North Carolina statute, did not address the right to privacy contention. It upheld the assessment of the $128 deficiency, however, and we now affirm.

I.

N.C.Gen.Stat. § 14–184, long in effect in North Carolina, provides:

"If any man and woman, not being married to each other, shall lewdly and lasciviously associate, bed and cohabit together, they shall be guilty of a misdemeanor."

* Honorable Walter E. Hoffman, Senior District Judge for the Eastern District of Virginia, sitting by designation.

1. 26 U.S.C.A. § 152(b)(5).

2. N.C.Gen.Stat. § 14–184.

In the Commissioner's audit of Ensminger's tax return the North Carolina statute became relevant because § 152(b)(5) of the Internal Revenue Code provides:

"An individual is not a member of the taxpayer's household if at any time during the taxable year of the taxpayer the relationship between such individual and the taxpayer is in violation of local law."

 We construe § 152(b)(5) as requiring the Commissioner to apply the North Carolina statute in the absence of any authoritative declaration of its invalidity. We may not read into the statute qualifying words which would limit its application to local laws which are constitutionally valid. We find no direct reference to the matter in the legislative history of § 152(b)(5). We cannot believe that the Congress intended the Commissioner to judge the constitutional enforceability of such state statutes or that their constitutionality be litigated in the Tax Court when the impact on public revenues might be slight and the state, which has the primary interest in upholding its statutes, is not even present. This is consistent with the allocation of primary authority to states in matters affecting marriages and the general deference of Congress to the states in such areas of the law.

The regulation of marriage, family life and domestic affairs "has long been regarded as a virtually exclusive province of the States."[3]

 In its application of the tax laws there has been a consistent deference by Congress to state laws in such matters. For example, marital allowances are available only if the man and woman taxpayers are legally married under the laws of the state in which they reside. See *John T. Untermann*, 38 T.C. 93 (1962). Apparently, the Congress and the Tax Court thought it would be unseemly for the federal tax advantages of marital status to be extended to persons who are unmarried under the laws of the state in which they reside. Similarly § 152(b)(5) serves the same policy of federal deference.[4] Though the Tax Court had reached the same result, holding that the word "dependent" did not include one living in an illicit relationship with the taxpayer,[5] the possibility of successful claims for deductions for such "dependents" lead to the enactment of § 152(b)(5) in 1958. It was the intention of the Congress to preclude any dependency deduction for the partner of a taxpayer when the two were living in a quasi-marital relationship, which is illicit under the laws of the state in which they reside. See S. Rep. No. 1983, 85th Cong., 2d Sess., *reprinted* in [1958] U.S.Code Cong. & Admin.News, pp. 4791, 4804.

Congress undertook no determination of the legality of any kind of interpersonal relationship. Section 152(b)(5) leaves that determination entirely to the individual states and assures that Congress will not appear to reward behavior which may be in contravention of state law. The result is one of wide diversity. In 1975 California repealed its criminal sanctions for sexual activity between consenting adults.[6] Thus, a taxpayer living in California with an unmarried woman would be allowed the deduction, while it is unavailable to Ensminger. This produces some inequality in taxation, but it illustrates the deference Congress has demonstrated for state laws in this area and its attempts to insure that, in the application of federal tax laws, taxpayers will be treated in their intimate and personal relationships as the state in which they reside treats them.

The North Carolina statute has never been declared unconstitutional by any court in any reported decision. On the contrary,

---

**3.** *Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975); *Pennoyer v. Neff*, 95 U.S. 714, 734–35, 24 L.Ed. 565 (1878).

**4.** Federal deference in matters within the state police power reflects more than a policy of comity. In fact, it represents a constitutionally derived recognition of the essential character of state government within our federal system. See *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

**5.** *Leon Turnipseed*, 27 T.C. 758 (1957).

**6.** 1975 Cal.Stats., chapt. 71, §§ 5–12.

it has been declared constitutionally enforceable. *See State v. Robinson*, 9 N.C. App. 433, 176 S.E.2d 253 (1970). In 1974 it was a facially valid state statute made applicable by § 152(b)(5). The only basis upon which the Commissioner could have refused to apply the North Carolina statute would have been a subjective judgment that it was not constitutionally enforceable, and the power to make such a judgment had not been conferred upon him by the Congress.

■ We conclude that a frontal attack upon the North Carolina statute as a violation of a constitutionally protected right to privacy may not be maintained in this federal tax proceeding.

## II.

■ If the taxpayer may, not in this proceeding assert his right of privacy claim in a frontal attack upon the North Carolina statute, he can assert any constitutional infirmity there may be in § 152(b)(5) of the Internal Revenue Code or in its application here. In a supplemental brief, after the court had raised the problem with which we dealt in Part I, he has undertaken to redirect his attack against the federal statute. Any conceivable impact of the federal statute upon the exercise of any constitutionally protected right of privacy is so indirect and remote, however, that the federal statute may not be questioned on that ground. There is a rational basis for the federal statute in its attempt to conform the impact of the federal tax laws to state laws governing such personal relationships, and the federal statute need not be subjected to strict scrutiny because of an indirect and remote impact upon the exercise of a right claimed to be constitutionally protected.

In *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) orthodox Jewish merchants challenged the validity of a Sunday blue law. They argued that since their religion required them to forego business transactions on Saturday, the additional burden of closing on Sunday would place severe economic burdens upon the exercise of their religious beliefs. They further asserted that the presence of these burdens

would prevent other Jewish merchants from accepting the orthodox teachings. The Court agreed that the blue law "may well result in some financial sacrifice in order to observe their religious beliefs;" however, the Court refused to nullify the ordinance at issue because "[t]o strike down . . . legislation which imposes only an indirect burden on the exercise of religion, *i. e.*, legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature." *Id.* at 606, 81 S.Ct. at 1147. By way of explanation, the Court proffered a telling example:

> Statutes which tax income and limit the amount which may be deducted for religious contributions impose an indirect economic burden on the observance of the religion of the citizen whose religion requires him to donate a greater amount to his church.

*Id.* The Court apparently considered such statutes to be constitutional. Accordingly, appellate courts addressing tax related, indirect infringements on religious freedom have found no constitutional violation. *E. g., Hearde v. Commissioner*, 421 F.2d 846 (9th Cir. 1970) (indirect burden on religious exercise constitutional when regulation reasonable). Similarly, the Internal Revenue Code has withstood due process challenges which asserted that the code unduly interfered with one's right to marry or remain single. *Jansen v. United States*, 567 F.2d 828, 829 (8th Cir. 1977) (law which gives married person filing jointly preference over single taxpayer not violative of freedom of association); *Barter v. United States*, 550 F.2d 1239 (5th Cir. 1977) (no constitutional violation in "marriage penalty" provisions of I.R.C.); *Mapes v. United States*, 576 F.2d 896 (Ct. Cl. 1978) (discrepancies in tax rate structure do not interfere with fundamental right of marriage); *see also Habeeb v. Commissioner*, 559 F.2d 435 (5th Cir. 1977); *Wexler v. Commissioner*, 507 F.2d 843 (6th Cir. 1974).

Two recent Supreme Court decisions, *Califano v. Jobst*, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) and *Zablocki v. Redhail*,

434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), shed some light upon the Court's approach to direct and indirect burdens on fundamental rights. Both cases dealt with impacts upon the concededly fundamental right of marriage—a right logically relevant to the facts presented here. Moreover, in both cases, the level of judicial scrutiny bore directly upon the nexus between the alleged interference and the asserted right.

In *Jobst*, the Court was faced with a challenge to a provision of the Social Security Act which assertedly interfered with a disabled person's decision to marry:

> Mr. Jobst has been disabled by cerebral palsy since his birth in 1932. He qualified for child's insurance benefits in 1957, several months after his father died. In 1970 he married another cerebral palsy victim. Since his wife was not entitled to benefits under the federal act, the statute required the Secretary to terminate his benefits.

434 U.S. at 48, 98 S.Ct. at 96. Had Jobst's wife been entitled to benefits under the Act, both could have continued to receive benefits. Jobst argued that this statutory anomaly penalized him for choosing to marry a person not covered by the Act. This, he contended, violated his constitutionally protected right to marry. The Court stated, "It is true . . . that the [provision] may have an impact on a secondary beneficiary's desire to marry, and may make some suitors less welcome than others." *Id.* at 58, 98 S.Ct. at 101. However, the purpose of the provision was ease of administration and this tangential "impact" upon a marital decision did "not violate the principle of equality embodied in the Due Process Clause of the Fifth Amendment." *Id.*

*Zablocki* was decided slightly more than two months after *Jobst*. At issue in *Zablocki* was a Wisconsin statute which required that an individual obligated to make child support payments receive a court's permission prior to entry into a marriage. Such permission could not be granted unless that person demonstrated "that the children covered by the support order 'are not then and are not likely thereafter to become public charges.'" 434 U.S. at 375, 98 S.Ct. at 674–75. The Court held that the statute directly and impermissibly violated the affected party's right to marry. However:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed. . . . The statutory classification at issue here, however, clearly does interfere *directly* and *substantially* with the right to marry.

Id. at 386–87, 98 S.Ct. at 681 (emphasis added).

The *Zablocki* Court specifically distinguished *Califano v. Jobst*:

> The directness and substantiality of the interference with the freedom to marry distinguish the instant case from *Califano v. Jobst* . . .. As the opinion for the Court [in *Jobst*] expressly noted, the rule terminating benefits upon marriage was not "an attempt to interfere with the individual's freedom to make a decision as important as marriage." . . . The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and . . there was no evidence that the laws significantly discouraged, let alone made "practically impossible," any marriages. Indeed, the provisions had not deterred the individual who challenged the statute from getting married, even though he and his wife were both disabled.

434 U.S. at 387 n.12, 98 S.Ct. at 681–82.

We think this case presents an interference with privacy rights roughly similar to that evidenced in *Jobst*. The purpose of § 152(b)(5) was not to proscribe any particular conduct. The statute was designed to insure that Congress was not treading upon an area of the law exclusively within the

realm of the individual states. If a state wishes to permit sexual relations between consenting adults, § 152(b)(5) will not preclude such a policy. Moreover, even as applied to North Carolina residents, the resulting disallowance places no direct interference in the path of an unmarried couple's decision to cohabit. Thus the interference, if any, is neither direct nor substantial. To paraphrase the Court in *Zablocki*: The provision did not deter Ensminger and Frommeyer from living together in the relationship they desired. The impact of § 152(b)(5) was wholly indirect and collateral to their decision to cohabit.

### III.

The taxpayer also sought to attack the North Carolina statute on vagueness grounds. Were it truly vague in the sense that Ensminger could not reasonably have predicted its application to him, there might be a serious question of the validity of that application of § 152(b)(5) in this case, but there is no such vagueness. The North Carolina statute has been held not to proscribe single or occasional sex acts. It proscribes more or less habitual intercourse in a relationship such as that between the taxpayer and the young woman living with him, *State v. Kleiman*, 241 N.C. 277, 85 S.E.2d 198 (1954), though repeated sex acts within a period of several weeks may be found to be the habitual intercourse proscribed by the statute. *State v. Davis*, 229 N.C. 386, 50 S.E.2d 37 (1948); *State v. McDuffie*, 107 N.C. 885, 12 S.E. 83 (1890); *State v. Robinson*, 9 N.C.App. 433, 176 S.E.2d 253 (1970). In light of these controlling constructions of the North Carolina statute, the taxpayer cannot contend that he did not have fair notice of the statute's application to his conduct. *Wainwright v. Stone*, 414 U.S. 21, 22, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

### IV.

Of course, we have not considered the merits of the taxpayer's claim of a constitutional right of privacy. What we do will not foreclose his raising that claim in any other proceeding in any other court having jurisdiction to hear and determine it.

*AFFIRMED.*