WALTER H. and EDITH M. PUSCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pusch v. Commissioner
Docket No. 5127-77.
United States Tax Court
T.C. Memo 1980-4; 1980 Tax Ct. Memo LEXIS 581; 39 T.C.M. (CCH) 838; T.C.M. (RIA) 80004; January 10, 1980, Filed Walter H. Pusch, pro se. Thomas G. Norman, for the respondent. SCOTT MEMORANDUM FINDINGS *582 OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable year 1973 in the amount of $509.67. The issue for decision is whether petitioners are entitled to a deduction under section 170, I.R.C. 1954, [1] for the value of three certificates of deposit which they transferred to the name of the Church of the Tolerants during the taxable year 1973. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Houston, Texas, at the time of filing their petition in this case, filed a joint Federal income tax return for the calendar year 1973 with the Director of the Internal Revenue Center in Austin, Texas. In the early 1950's, Walter H. Pusch (hereinafter petitioner) founded an association which he supported based on the concept that every individual should be free to choose his own beliefs as long as he does not interfere with others. For some time petitioner was *583 the only member of this association. In the early 1960's, petitioner discovered that some other persons were iterested in his concepts, and in his view his assocition became a religion. At some point petitioner adopted the name the Church of the Tolerants (sometimes hereinafter the Church) for his association. The Church of the Tolerants is not incorporated and is not registered with any governmental agency, local, state or Federal. Petitioner believes that incorporation of the Church or registration with any governmental agency is an intrusion of the state into the rights of the individual to his own religious beliefs. The Church of the Tolerants has no charter and has no by-laws. In 1969, petitioner filed an application on behalf of the Church of the Tolerants with the Internal Revenue Service for classification as an organization exempt from tax under section 501(c)(3). The Revenue Service requested certain information in connection with its consideration of the application, and petitioner dropped the application without furnishing any of the requested information. When other persons began to evidence an interest in becoming adherents of the Church of the Tolerants, petitioner *584 developed a kit which contained a Certificate of Ministry, writings which bore statements by the Church of the Tolerants, [2] a form of a marriage certificate and a Certificate of Formal Naming. Members or adherents are obtained primarily by word of mouth. However, at one time an advertisement seeking members was placed in the bulletin of MENSA, an association for those with I.Q.'s of over 150. Enrollment in the Church is conditioned only on a pledge from the applicant that he will not interfere with the way of life of others. The beliefs of the Church are summarized on a Certificate of Ministry as follows: *585 TOLERANTS embrace all the diversities of humanity in all aspects, religious and secular, pronouncing to each, YOU are RIGHT …. but with the provisos: IF you recognize that I, diffring from you, am also right; and others differing from us both and from each other are also right; and that no one is enslaved to any ONE way but is free to continue or to change--whichever way-of-life best fits his/her pursuit-of-happiness… so long as pursuing one way of life does not intrude upon the equal rights of others to pursue their various ways of life. Tolerants abhor the privileges, direct subsidies, direct subsidies, indirect subsidies as of tax exemption, and other unfair advantages so zealously promoted by INtolerants; but recognize that to spurn these is to hamstring tolerance, to assist the bigots of autocratic INtolerance. Thus Tolerants may serve others flexibly according to their preferences of ritual, sacrament, ceremony--to be validated by civil authority; and are to be accorded privileged-communication rights, military service chaplaincy rights, clergy discounts where granted others, tax exemptions granted ANY religion, etc… subject if necessary to legal action to enforce *586 First Amendment. No financial pledge is required for enrollment in the Church of the Tolerants. Upon enrollment, some persons do pay for the cost of the materials in the kit distributed by the Church. The Church of the Tolerants does not ordain its ministers. Petitioner considers that he is a self-ordained minister and considers some other enrollees to be ministers doing work for the Church. Although petitioner has never performed a wedding or other ceremony or sacraments, he considers himself authorized to do so as a self-ordained minister of the Church. The Church does not have a place of worship and does not hold any form of regular services. It has no formal operation. Petitioner, during the year here in issue, maintained a bank account in the name of the Church of the Tolerants. He had complete control over this account. There were no restrictions on his usage of the funds in the account. The funds received for kits are received by petitioner. Petitioner has complete control of the financial affairs of the Church. Whatever amount petitioner decides he needs as living expenses over and above what he receives from salary or social security he takes from the checking *587 account of the Church. The funds necessary to pay attorneys fees and other costs in connection with a suit against petitioner by the Internal Revenue Service to enforce a summons were taken from the Church checking account. Petitioner has a lock box which is also used by the Church. He has placed a statement signed by him in this box to the effect that in the event of dissolution of the Church the funds are to go to an exempt organization, whether church or non-church, at the complete discretion of the person entitled to distribute the funds. Petitioner is the person entitled to distribute the funds of the Church. In 1973, petitioners transferred to the Church three certificates of deposit with a value at the date of transfer of $1,239.33 each. Petitioners on Schedule A of their 1973 Federal income tax return claimed as a deductible cash contribution the value of the three certificates. Respondent in his notice of deficiency disallowed this claimed deduction with the following explanation: It is determined that the deduction claimed on your income tax return in the amount of $3,627.70 for contributions to the Church of the Tolerants is not allowed because it has not been established *588 that the organization qualifies under section 501(c)(3) of the Internal Revenue Code. Accordingly, your taxable income is increased in the amount of $3,627.70. [3] OPINION Section 170(a) provides for the allowance of deductions for charitable contributions as defined in section 170(c). Section 170(c)(2) defines a charitable contribution to include a contribution or gift to or for the use of-- (2) A corporation, trust, or community chest, fund, or foundation-- * * *
(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) no substantial part *589 of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation * * * Respondent takes the position that petitioners have failed to establish that the Church of the Tolerants meets the requirements of a charitable or religious organization as set forth in section 170(c)(2). Petitioners' argument is in large part a contention that the deductions allowed under section 170(a) and (c)(2) are unconstitutional since the provisions of section 170(c)(2) are contrary to the provisions of the First Amendment to the Constitution prohibiting laws respecting the establishment of religion. However, petitioners also argue that the requiring of information to support their claimed deduction violates their rights under the Fifth Amendment and based on the holding in Morey v. Riddell,205 F. Supp. 918 (S.D. Cal. 1962), contend that if section 170(c)(2) is not unconstitutional, they are entitled to the deduction provided for by section 170(a). [4] Respondent contends that petitioners have failed to show that (1) the Church is organized and operated exclusively for religious purposes, and (2) that no portion of the net earnings of the Church *590 inures to the benefit of a private individual. *591 On the basis of this record we agre with respondent that petitioners have failed to show that either of these requirements has been met. There is no showing in this record of any religious-type function engaged in by the Church. The record shows that the Church held no services or meetings. Although the Church had a "Marriage Certificate" form, there is no showing in the record of any marriages, other ceremonies or sacraments performed by any "minister" or representative of the Church. Insofar as this record shows, the major function of the Church was to protest the exemption from tax of churches under section 501(c)(3) and the allowance under section 170 to individuals of deductions from income tax for contributions to churches. This record totally fails to show that the Church was organized and operated exclusively for religious purposes. Cf. Western Catholic Church v. Commissioner, 73 T.C.     (Oct. 31, 1979), involving section 501(c)(3). Also, this record totally fails to show that no part of the earnings of the Church inured to the benefit of a private individual. The record shows that petitioner had complete control over the bank account of the Church and during *592 the year here in issue used its funds as he saw fit. Petitioner testified that "I and the Church have no real separate financial identities." While petitioner stated that the amount he took from the Church was only the minimum necessary to supplement his other income, his testimony was clear that he alone determined that amount. On the record as a whole, petitioner has failed to establish that none of the earnings of the Church inured to his benefit. Even more clear from this record is that petitioner could acquire the assets of the Church upon its dissolution, which insofar as this record shows would be entirely within his control. This fact alone is sufficient to cause the Church not to meet the definition contained in section 170(c)(2) of an organization to which contributions are deductible. Calvin K. of Oakknoll v. Commissioner, 69 T.C. 770 (1978). In the Oakknoll case, we found that the taxpayers, the only members of the religious organization in question, had failed to carry their burden of proof because they had "done nothing to irrevocably commit disposition of the assets to another qualifying charity if the [organization] were to dissolve." In *593 the instant case, the only evidence of what is to be done with the Church funds upon its dissolution is in the following testimony of petitioner: THE WITNESS: It is possible for--and instructions are there--that in the event of dissolution, the funds are to go to an exempt organization, whether church or non-church, which is engaged in the same pushing for freedom and tolerance. And it would be up to--the choice of whoever the holder or the person who would then have to distribute those funds. MR. NORMAN: Who could distribute these funds? A Whoever the successor would be, in event of a dissolution of the church. THE COURT: It would be you now, wouldn't it? THE WITNESS: Right now it would be me, yes. THE COURT: All right. MR. NORMAN: You say that there's been made a provision for this. What--in what? What has the provision been made in since there's no charter? A The provision has been made in a statement which is filed away in a lock box. THE COURT: And the statement is by who? THE WITNESS: The statement is by me. MR. NORMAN: And is it in your lock box? A It is in the lock box which is used by the church. And because of circumstance that is--that was *594 in this opening statement and is that--I and the church have no real separate financial identities. In our view, this testimony does not show an irrevocable commitment by the Church to dispose of the assets to another qualifying charity upon dissolution. In fact, it establishes to the contrary. This evidence shows that petitioner remained in control of the funds and that the funds were therefore not irrevocably committed to anything but petitioner's discretion. Petitioners maintain that the arguments made by respondent in this case were all rejected in Morey v. Riddell, supra. In that case, the taxpayers had made contributions to a church which has no distinctive identifying name, no written charter or operational guide other than the Holy Bible, no permanent head-quarters, no comprehensive records, and no church-designated bank account. In that case the Government conceded that the purposes of the church were exclusively religious, but argued that the church was not an organized association. The court noted that while factors such as lack of a distinctive name and a written charter might be indicative of an absence of unity of purpose or operation, the *595 reasons for these characteristics in the Morey case were the very doctrines that bound its members together. It was shown that adherence to their philosophy had in fact bound the members together in an organized association for many years. The members worshiped together in homes and rented halls. They worked together to further the purpose of the church. They held regular meetings and had camp meetings. They sponsored radio broadcasts, printed and distributed bible literature and had ministers from whom they accepted guidance and who performed marriage ceremonies accepted as valid by civil authorities. All this had been the facts for many years. Thus, the court held that-- while the church [lacked] some of the indicia of organization, it plainly [was] an organized association of persons dedicated to religious purpose. The Government also argued in the Morey case that the church was not a qualified organization because no showing had been made that in the event of dissolution the assets would by operation of law be distributed solely for religious purposes. The court stated that the evidence established that the church had no substantial accumulation of funds *596 and operated in a manner that assured expenditure of its funds almost upon receipt. For this reason, the court concluded there was no possibility of applying the funds received by the organization to other than religious purposes. The Government's final argument in the Morey case was that the contributions to the church inured to the benefit of individuals because the ministers employed a portion of the contributions to pay for their living expenses. The court held that the sums expended by the ministers were in effect their salary and did not inure to the benefit of individuals as distinguished from being legitimate expenses of the church in implementing its religious purpose. This case is totally distinguishable from the Morey case. Here respondent has not conceded that the Church was operated exclusively for religious purposes. As heretofore stated, the evidence indicates that it was not operated exclusively for religious purposes. Not only does petitioner retain complete control over funds of the Church, but the literature which the Church distributes portrays other than religious purposes of the Church. As set forth in our findings of fact, the literature distributed *597 by the Church suggests that a major purpose of the Church is to have section 501(c)(3) and 170(c)(2) declared unconstitutional. [5]
*598 An attempt to have a Revenue statute declared unconstitutional is certainly not a religious purpose. There is not in the record in this case any evidence of religious services, meetings or any other religious activities. In the Morey case, the court found that the organization had held religious meetings and conducted religious activities for many years. The evidence here shows that the Church does not expend its funds immediately upon receipt as did the organization involved in the Morey case. Therefore, the question of the disposition of the funds upon dissolution is not academic here as it was in the Morey case. The facts in the instant case are similar to those in Calvin K. of Oakknoll v. Commissioner, supra.The record indicates that petitioner was in complete control of the Church's funds rather than merely being in effect paid a salary by the Church. Petitioner has failed to prove facts which would bring this case within the holding of the Morey case. Petitioners' primary argument in this case is that any law allowing the deduction fr a contribution to a church that meets specified standards, and not allowing the deduction for contributions *599 to a church that refuses to show compliance with those standards, violates the First Amendment prohibiting laws respecting the establishment of religion and the free exercise of religion.It is petitioners' position that the constitutional prohibition is an absolute one extending to any law which touches the religious arena. This view of the First Amendment freedom of religion provision is contrary to the following statement of the Supreme Court in Braunfeld v. Brown, 366 U.S. 599, 606 (1961): To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i.e., legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature.Statutes which tax income and limit the amount which may be deducted for religious contributions impose an indirect economic burden on the observance of the religion of the citizen whose religion requires him to donate a greater amount to his church; * * * The list of legislation of this nature is nearly limitless. This Court has held on numerous occasions that *600 Federal income tax laws imposing incidental burdens on religion are not prohibited by the First Amendment. See, Black v. Commissioner, 69 T.C. 505, 510-511 (1977) (section 214 effect on religion only incidental); Russell v. Commissioner, 60 T.C. 942, 945-947 (1973) (religious belief contrary to war in Southeast Asia not sufficient to allow taxpayer the privilege of not paying taxes). In our view, the allowance of charitable deductions for contributions to churches as defined by section 170(c)(2) and the regulations issued pursuant thereto is not in violation of the First Amendment. See Braunfeld v. Brown, supra at 605-607.
Petitioners also argue that denial of their claimed charitable deduction was a result of discriminatory enforcement of the Revenue laws in violation of the due process clause of the Fifth Amendment. The record in this case does not establish any discrimination against petitioners by respondent or any of his agents. Petitioners have not shown any violation of their rights under the Fifth Amendment. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years involved.↩
2. The statement attached to Madison's "Memorial and Remonstrance Against Religious Assessments" is typical of the statements attached to other writings included in the kit. This statement of the Church of the Tolerants is as follows: --to this we Tolerants wish to add that a subsidy from tax-funds is no less a support from taxing-power when it results from 'contributions-deductibility' that in effect forces government to contribute up to $70 for each $30 contributed to a church by any one of its adherents. There is no less a vicious subsidy when church property and income therefrom (and from church-owned businesses) is 'tax-exempt'. Even worse is the economic power thus accreted to bigot-churches which hold 'MY way is THE ONLY way' bigot-concepts which have as their goal the destorying of all liberty, of all freedom of conscience, thus supplanting 'democracy' with 'theocracy' where a totalitarian hierarchy dictates to all. One such power-complex even issued a directive ordering its local units to pressure outsiders to do as it says 'OR ELSE'… noting that it has the 'clout' of over $160,000,000,000 of tax-free assets to FORCE abject compliance to its 'line'!!! Why, then, do we Tolerants demand the same deductible contributions and the same exemptions that bigots get? Because those who believe in freedom accomplish nothing by mere talk. Because Tolerants can, by becoming as exempt as bigots, as rightfully keep from the tax-collector some freedom-cause-supporting money as bigots keep bigotry-supporting money. Because our becoming as exempt as the bigots will eventually result in a test-case as to whether such exemptions should be continued; and, Constitutionally, outlawing of exemptions for US will result in the most welcome outlawing of ALL exemptions and contribution-deductibilities EVERYWHERE. And this, then, with nobody escaping taxes, will swell the ranks of those fighting to bring taxes down to their proper and reasonable level: So long as SOME get and OTHERS do the paying wildly-expensive government projects will grow even wilder; but once EVERYONE pays--and protests, and votes out any pork-barrel wastrel--EVERYONE will be better off (except those riding on the backs of others)…. THE TOLERANTS Write TODAY to ACT: Association of Churches of the Tolerants. Find out how you, as a lover of LIBERTY, can so 'churchify' your beliefs (whatever they be; as we, as Tolerants, respect each and any belief not imposing itself upon others) so that you can enjoy the same exemptions &c that bigots have so long used to build their evermore threatening powers… until these 'steals' are properly outlawed everywhere for everyone. the Tolerants / POB 36099 HOUSTONTX 77036↩
3. The stipulation of facts filed at the trial contains the statement: The Commissioner disallowed the charitable contribution of $3,627.70 because he claims the "Church of the Tolerants" did not meet the requirements of I.R.C. secs. 501(c)(3) and 170(c)↩.
4. At the trial petitioner referred to the case he had pending in the United States Court of Appeals for the Fifth Circuit contesting the constitutionality of section 501(c)(3), I.R.C. 1954. Petitioner stated that he believed that the decision in this case, if favorable to him, would control his constitutional argument in the instant case. The decision in the case referred to by petitioner, United States v. Pusch, 605 F.2d 153 (5th Cir. 1979), was entered on October 17, 1979. This opinion states in part: This is an appeal from a district court order enforcing an Internal Revenue Service (IRS) summons issued against Walter H. Pusch. Pusch is the creator and executive director of the Church of the Tolerants (Church), which is the subject of an IRS investigation to determine its potential income tax liability from 1972 to 1975 and its qualification for tax exempt status under I.R.C. section 501(c)(3). n1 Pusch refused to honor the summons and produce Church records, arguing that section 501(c)(3) is unconstitutional because it establishes an income tax exemption for religious organizations in violation of the establishment clause of the first amendment. n2 * * * Pusch's sole contention here is that he need not comply with the order because section 501(c)(3) is unconstitutional. n1 This provision provides, in pertinent part, that among the institutions immune from taxation are "[corporations], and any community chest, fund, or foundation, organized and operated exclusively for religious… purposes…." n2 U.S. Const. Amend. 1 provides, in part, "Congress shall make no law respecting an establishment of religion…." The enforceability of the summons is in no way dependent upon the validity of section 501(c)(3). If section 501(c)(3) were unconstitutional, the Church might be subject to income taxation and the summons would be enforceable in order to permit the IRS to determine its tax liability. If, on the other hand, the provision is valid, the IRS must be able to determine the Church's eligibility for tax exemption under section 501(c)(3)↩ through an examination of its records. Since Pusch, who bears the burden of demonstrating that the district court abused its process in this case, * * * has failed to show any reason why this summons should not be enforced, the judgment of the district court must be affirmed.
5. One leaflet distributed by the Church entitled "BUNK" contains the following statement: There is ONE good reason for such individualists being associated with a group that recognizes their individual high qualification to minister-to-self: TAX-"STEALS" and their threat to ALL FREEDOM: A then-General-Secty. of the World Council of Churches pointed out some years ago that big-money-bigots, their church-wealth enhanced by taxexemptions, are getting so strong thereby that "they should be able to control the whole economy of the nation in the near future".A freedom-minded citizen by himself can do nothing about this but merely protest, which accomplishes nothing. But one who joins with us, of the ASSOCIATION OF CHURCHES OF THE TOLERANTS, POB 36099, Houston, Tx 77036; who is thus ordained to minister to his/her own individualistic belief; who is thus allowed by law to get nonreportable/nontaxable ministerial allowances for his housing and other allowable expenses and for local-church investments, thus getting back into use and control substantially all the up-to-half-income contribution-exemption Internal Revenue laws allow… all perfectly legally, avoidance, NOT "evasion"… is DOING SOMETHING PRACTICAL about the ever-growing threat of bigot-takeover to an Orwellian "1984" "brain-washed zombie" society…↩